State, ex rel., v. Williams.

STATE, EX REL., WELLFORD, *v.* J. J. WILLIAMS, MAYOR.

(*Jackson.* April Term, 1903.)

1. **MANDAMUS.** Power to issue, practice, and making up issues regulated by statute; pleadings governed by common law.

   The power to issue mandamus and the practice under it, is, to some extent, regulated in this State by statute, by which the return to the writ is made traversable, and the averments of the petition may be put in issue by denial, on the return or answer, in which event the case will be determined by the court, or tried by the court on evidence. With these exceptions, the proceeding is one largely controlled by the rules of pleading established by the common law. (*Post, p.* 556.)

   Cases cited and approved: State v. Marks, 6 Lea, 12, 17; Harris v. State, ex rel., 96 Tenn., 496, 513.

   Code cited and construed: Sections 5331-5339 (S.); 4310-4318 (M. & V.); 3567-3575 (T. & S. and 1858).

2. **SAME.** Intendments against insufficient answer.

   Whenever it appears that the return to a writ of mandamus fails to answer the important facts alleged in the petition, every intendment will be made against it. (*Post, p.* 556.)

   Cases cited and approved: Harris v. State, ex rel., 96 **Tenn., 496,** 513.

State, ex rel., v. Williams.

3. **SAME.** Same. Allegations not denied taken as true.

The allegations in the petition for a writ of mandamus not denied nor confessed, and avoided in the answer thereto, are taken to be true. (*Post*, *p.* 556.)

Case cited and approved: Harris v. State, ex rel., 96 Tenn., 496, 513.

4. **SAME.** Motion for peremptory writ upon pleadings is equivalent to demurrer to answer.

If the relator in a mandamus proceeding moves for a peremptory writ upon the pleadings, this motion is equivalent to a demurrer to the answer or return for not stating facts sufficient to constitute a defense. (*Post*, *p.* 556.)

Cases cited and approved: State, ex rel., v. Marks, 6 Lea, 12, 18-19; Harris v. The State, ex rel., 99 Tenn., 496, 513.

5. **SAME.** If set for hearing on bill and answer, latter taken as true.

Where, in a mandamus proceeding in the chancery court, the cause is set down for hearing by the complainant or petitioner, on the bill or petition and the answer of the defendant, every fact properly set out and averred in the answer must be treated as proved and as true. (*Post*, *pp.* 576-577.)

6. **MUNICIPAL CORPORATIONS.** Right of corporator to examine books not prevented by ordinance, when.

A provision of a city ordinance that every officer or agent of a city shall at all times, whenever requested, submit his books and official papers to the inspection of the mayor, or any member of the legislative council, or to any person or committee authorized by the legislative council to examine the same, is not exclusive so as to prevent the examination of such books by any person other than those specifically designated, even if the

State, ex rel., v. Williams.

right of a corporator to make an examination on suitable occasions can be cut off by an ordinance or by-law. (*Post, pp.* 573-574, 576, 590.)

Case cited and doubted: People, ex rel., v. Cornell, 47 Barb., 329.

7. SAME. Taxpayer's right to examine books not prevented because grand jury has right to do so.

The general right and power of the grand jury to examine the books of the municipal officials is not exclusive, so as to prevent such examination by a resident citizen and taxpayer of the municipal corporation. (*Post, pp.* 575-576, 590.)

8. SAME. Examination of books cannot be refused because of applicant's political hostility, when.

The fact that the corporator making application for the privilege of examining the books of the municipal corporation is politically hostile to the administration and to the custodian of the books furnishes no excuse for refusing to permit such examination, unless it shall appear that the examination is sought with the corrupt purpose of merely furthering such animosity. (*Post, pp.* 563, 590.)

9. SAME. Examination of books cannot be refused on the ground of inconvenience.

The worry and inconvenience resulting from the examination of the books and records of a municipal corporation, and the fact that the transactions to be examined are numerous and involve many millions of dollars, furnish no sufficient reason for denying a corporator the right to examine such books. (*Post, pp.* 574-575, 590-591.)

10. MANDAMUS. To compel permission to examine city's books where no fraudulent or dishonest purpose appears.

Where, in a mandamus proceeding, to compel the mayor of a city to allow the relator to examine the books of the city, it appears that prior to the application for permission to examine the said books, the city was much indebted, and without funds, and that a committee of two hundred citizens had been called

together by the mayor for the purpose of devising ways and means to raise revenue to meet the city's needs, and no facts appear to show that the proceeding was instituted for a fraudulent and corrupt purpose, but it appears that the application was refused by the mayor because in his opinion the proposition to examine the books was made to impede and thwart the object had in view by calling the committee of citizens together, rather than to forward such object, it is not shown that the relator was actuated by a fraudulent and dishonest purpose, such as to justify the denial of the writ of mandamus. (*Post, pp.* 591-592.)

11.  **SAME. Same.** Where examination of city's books is for the public interest,

The right of a citizen and taxpayer of a city to make an examination of the books and papers of the city, in theory, is absolute, but in practice, it is discretionary, for when refused by the custodian of the books, then the right must be enforced by mandamus, and this writ is not of absolute right, but merely discretionary, to be awarded only in a proper case so the right can be denominated only as "qualified right."

But where it appears to be important to the public interests that a general examination of the books of a municipality should be had, the court should allow such examination at the suit of one who is a citizen and taxpayer of a corporation. (*Post, pp.* 577-589, 592-593.)

Cases cited: Deaderick v. Wilson, 8 Baxt., 108; Herbert v. Ashburner, 1 Wilson, 297; King v. Babb, 3 Term Rep., 582; Rex v. Guardians of Great Farrington, 9 B. & C., 541; People, ex rel., v. Cornell, 47 Barb., 329; In re Steinway, 159 N. Y., 250; Cockburn v. Bank, 13 La. Ann., 289; State v. Einstein, 46 N. J. Law, 479; Bank v. Hunt, 76 Mo., 439; Wannell v. Kem, 57 Mo., 478; People v. Railroad, 50 N. Y. Sup., 456; Rex v. Shelley, 7 Term Rep., 746; Rogers v. Jones, 5 D. & R., 484; King v. Lucas, 10 East, 235; King v. Allgood, 4 M. & S., 162; Buck v. Collins, 51

State, ex rel., v. Williams.

Ga., 391; Webber v. Townley, 43 Mich., 538, 539; Bean v. People, 7 Colo., 201; Reg. v. Marquita Min. Co., 1 El. & El., 289; Rex v. Merchants' Co., 2 B. & Ad., 115; Commonwealth v. Iron Co., 105 Pa., 11; Railroad v. White, 1 L. B., 282; Imp. Gas Co. v. Clark, 7 Bing., 95; Hoyt v. Bank, 1 Duer, 652; Rex v. Hostman, 2 Strange, 1223; Mayor of Southampton v. Graves, 8 T. R., 590.

12. **SAME. Same. Examination of city's books for specific purpose.**

The right to an examination of a city's books, for a special purpose, as to obtain specific information to use in litigation, and the like cases, while not in principal standing upon higher grounds, yet is the more easily grantable, because such examination does not involve so much time, and so much inconvenience to the custodian of the books and papers, and so much interruption of business as in case of a general examination. (*Post, p.* 593.)

13. **SAME. Same. For general examination of city's books, grantable, when.**

A general examination of a city's books, papers, and records, should not be lightly granted, nor permitted with unnecessary frequency; the occasion should be grave and important; the person seeking the examination should be trustworthy and at all times and at every stage, subject to the supervision of the court, for the prevention of oppression and the safety of the books and records. (*Post, pp.* 594-595.)

14. **SAME. Same. Same. Case in judgment.**

Where the period of examination sought covers a course of five years, during which time many millions of dollars were collected and expended, much money borrowed and interest paid, tax rates very heavy and very burdensome, application was made to the legislature for an increase of the means of raising taxes, the city became deeply indebted, a committee of two hundred citizens were called together by the mayor to devise ways and means for raising revenue to repair and improve the

State, ex rel., v. Williams.

streets, a taxpaying citizen was entitled to an examination of
the books of the city for the purpose of learning its financial
condition and ascertaining the true facts relative to the ex-
penditure of its revenues. *(Post, pp.* 595-596.)

15.  **SAME.** Commencement of proceedings fixes right to, which
    cannot be affected by subsequent acts of defendant.

    After judicial proceedings have been instituted for mandamus for
      the purpose of obtaining a general examination of the city's
      books, such proceedings can not be thwarted by the appoint-
      ment of a committee on the part of the custodian of the books,
      or his associates in authority, to make an examination in lieu
      of the one sought. The right of the petitioner becomes com-
      plete upon the filing of his petition, and can not be affected by
      subsequent acts of the defendant taken without his consent and
      to which he was not a party. *(Post, pp.* 596-597.)

16.  **SAME.** Writ directed to mayor as custodian of books.

    The mayor of Memphis, under the laws governing that city, is
      the custodian of the books and papers of that city in such
      sense that he can be justly called upon to produce them and
      he is vested with such powers as to make it proper that a writ
      of mandamus to enforce a taxpaying citizen's right to examine
      the books should be directed to the mayor. *(Post, pp.* 561-562,
      573, 597.)

    Cited:   Watkins Dig. (1902), pp. 19-20, secs. 4 and 6; p. 22, sec.
      1-2; p. 170, article 5.

17.  **SAME.** Remandment for entry of decree awarding tempo-
    rary writs, with directions.

    This cause was remanded to the chancery court of Shelby county
      for the entry of a decree awarding the peremptory writ with
      directions that such decree shall reserve to the court below the
      powers and control necessary to prevent oppression, and to
      secure the preservation of the books and papers, and to so order
      the examination as to interfere as little as practicable with the
      transaction of current business, and that said decree shall re-

State, ex rel., v. Williams.

serve to each party the right from time to time to apply to said court for instructions pending the examination. (*Post, p.* 597.)

FROM SHELBY.

Appeal from the Chancery Court of Shelby county.— F. H. HEISKELL, Chancellor.

CARROLL, McKELLAR & BULLINGTON and CARUTHERS EWING, for relator, Wellford.

W. B. HENDERSON, for Williams, Mayor.

MR. JUSTICE NEIL delivered the opinion of the court.

This was a proceeding instituted in the chancery court of Shelby county for a mandamus upon the defendant, as mayor of the city of Memphis, to compel him to allow the relator to examine the corporation books of the said city of Memphis with an expert accountant. An alternative writ was issued by the chancellor, to which the defendant responded. Thereupon the relator demanded the peremptory writ on the pleadings as they then stood. The chancellor denied the relief sought, and complainant has appealed and assigned errors.

In order to fully understand the scope of the litiga-

tion, it will be necessary to set out the substance of the bill or petition, and of the defendant's response or answer to the alternative writ.

Before doing this, in order to properly understand the legal effect of the allegations and averments in the pleadings referred to, it is necessary to state certain rules applicable thereto. In *Harris* v. *State, ex rel.,* 96 Tenn., 496-513, 34 S. W., 1017, it is said: "The power to issue mandamus, and the practice under it, is to some extent regulated in this State by statute. Code, 1858, sec. 3567 et seq.; *State* v. *Marks,* 6 Lea, 12. By these provisions the return to the writ is made traversable, and the averments of the petition may be put in issue by a denial in the return or answer, in which event the case will be determined by the court, or tried by the jury on evidence. With these exceptions, the proceeding is one largely controlled by the rules of pleading established by the common law. Among these rules, we think the following are well established: (1) Whenever it appears that the return fails to answer the important facts alleged in the petition, every intendment will be made against it. High on Ex. Leg. Rem., sec. 461. (2) The allegations not denied, nor confessed and avoided, are taken to be true. Merrill on Mandamus, sec. 274. (3) If the relator moves for a peremptory writ upon the pleadings, this motion is equivalent to a demurrer to the return for not stating facts sufficient to constitute a defense. High on Ex. Leg. Rem., secs. 521, 523; *State* v. *Marks,* supra."

With these principles in view, we shall now endeavor to ascertain the facts, as contained in the pleadings.

The petition contains the following allegations: That the relator is a resident citizen and taxpayer of the city of Memphis, and as such one of the incorporators of the city, which is a municipal corporation under and by virtue of chapter 11 of the Acts of 1879 and the acts amendatory thereof; that the defendant is the mayor and chief executive of the said municipality; that as such mayor and chief executive he has the custody of the books of the said city, on which are kept the receipts and expenditures of the funds of the said city; that in the said receipts and expenditures the relator, as a taxpayer and citizen, has a direct interest; that some time before the petition was filed the relator, uninvited, attended a meeting of two hundred invited citizens, called by the mayor, for the purpose of devising ways and means to assist the city administration to pave, repair, and "round up," more or less, the streets of the city, and, being interested in the material prosperity of the city, he afterwards attended the meeting of a committee of fifteen appointed at the aforesaid meeting of citizens; that the relator, having the interest of a corporator and taxpayer (the financial condition of the city showing the necessity for the providing of additional means for the purposes aforesaid and the tax rate being already very high and very burdensome), thought that business men, in the conduct of their own affairs, ought to know the sources of the revenue of the city and the items of ex-

penditure of that revenue, and thereupon the relator proposed to the said committee to provide for an examination of the books of the city, for the sole purpose of ascertaining the exact financial condition of the city, the sources from which it was received, and for what it had been paid out; that afterwards a subcommittee of five was appointed from the said committee of fifteen; that this subcommittee undertook to make such investigation as was practicable of a superficial character, and, having called upon the defendant for such information as would enable the members thereof to have a conception of the amount of revenue received, the sources from which it had been received, and the accounts to which it had been appropriated, the defendant, as mayor, furnished the committee with certain figures, which are exhibited with the bill and marked "A"; that the proposition of the relator for the examination of the city books by experts resulted in a declination by the chairman of the committee of two hundred before referred to; and that thereupon the relator demanded of defendant the right to make an examination of the books, records, papers, and vouchers in his possession, claiming, as a corporator and taxpayer in and of the city, the right to make a general inspection of the public records of the city, and to make copies of its public documents and records, under such rules and regulations as would insure their safety—the relator stating at the time that the books would be examined with the least possible inconvenience to the mayor and to the other officers of the city govern-

ment, and that he trusted that the examination might be made without any hard feelings between any officers of the city government and himself, but that this demand was ignored and refused, and treated with contempt and derision.

The petition then proceeds: "The relator is advised by counsel that the books of the city of Memphis are public records, and that as a corporator and taxpayer of said city of Memphis he has the right to inspect them, to make copies of them under such rules and restrictions as will preserve their safety; and he is entitled, to this end, to the benefit of agents and employees, and to the right of a general inspection. That the relator is informed and believes, and upon information of a public character avers the fact to be, that the refusal to grant him the right he claims by the defendant is not based upon any abuse or inconvenience likely to arise by inspection, examination, and making note of the records, or any damage or loss that is likely to ensue by reason of such examination of the records, but is predicated wholly upon the assumed and unwarranted claim of the defendant that the examination sought by the relator and demanded as of right is predicated of political animosity, which the relator says is ill-founded in fact; he claiming the right purely because of his interest as a corporator and taxpayer, and making the demands to the end that he may know that which he has he right to know —the exact status financially of the corporation of which he is a member, and what has become of its funds."

The prayer of the bill was for an alternative mandamus and for ultimate relief in accord with the substance thereof.

An alternative writ was issued in accordance with the prayer of the petition or bill, and thereupon the defendant filed his answer.

The answer does not deny that the relator was, at the time the petition was filed, a resident citizen and taxpayer of the city of Memphis; that he attended the meeting of citizens mentioned in the petition; that this meeting was called for the purpose stated; that the relator also attended the meeting of the subcommittee of fifteen and that he proposed to the committee to provide for an examination of the books; that the subcommittee of five was appointed as stated, and that the defendant furnished to that committee the figures mentioned in the petition; that the relator's request for an examination of the city's books by experts was declined by the chairman of the committee of two hundred; and that thereupon he demanded of the defendant the right to make an examination of the books, records, papers, and vouchers of the city, claming as a corporator and taxpayer the right to make a general inspection of the public records of the city, and to make copies of its public documents, under such rules and regulations as would insure their safety, and that this demand was refused by him. These facts, therefore, must be treated as established.

In response to the allegation that he was the custodian of the books and papers referred to, the answer contains

State, ex rel., v. Williams.

the following: "He denies that he is the custodian of the city's books as set forth in complainant's bill of complaint. His connection with or power over said books is controlled by ordinance, which provides as follows: 'The mayor shall have power to inspect such of the books, papers, and records of the officers of the city as may, in his opinion, be necessary to enable him to discharge the duties imposed upon him, and may call upon all of the officers of the city to furnish him in writing with any information connected with the respective offices.'"

Respondent states that under the legislative enactment creating the city of Memphis, and the acts amendatory thereof, the government of the said city is vested in a board of fire and police commissioners, a board of public works, and a legislative council. "The entire government of the city of Memphis, under and by virtue of the charter of the taxing district of Shelby county and the amendments thereto, is lodged in said two boards and legislative council and such agents as they and the mayor may appoint. The custody and the control of all of the property of the city, its books, and cash funds are under the control and supervision of said boards and legislative council, and county trustee of Shelby county; he being the tax collector of the city.

"Respondent further states that, under the legislative enactments creating the city of Memphis and the ordinances thereof, the custody of all the city books is vested in the secretary and bookkeepers of the various city de-

partments, the county trustee, and a general secretary of the city government, who do not hold them for, or subject to, the orders of the mayor, but as the officers and representatives of the board of fire and police commissioners and the board of public works and the legislative council of the city of Memphis, and subject to such duties with regard to the same as are imposed upon them by law.

"Respondent has not the right, under and by virtue of the laws and ordinances of the city of Memphis, to grant the inspection of the books demanded by complainant in his bill."

In an amended answer he adds concerning the custody of the books as follows: "Respondent does not have the charge or control of the books of the city, as he has already explained; they being in the possession and control of W. B. Armour, the secretary of the city, and other secretaries and bookkeepers, who are under heavy bond for the correct and honest keeping of the books, their custody, preservation of papers, etc." The matters here referred to are partly matters of law and partly matters of fact, and the question as to the defendant's right of custody to the papers and records referred to will have to be determined later by the language of the charter, taken in connection with the ordinance above referred to and the facts above stated.

As to the refusal on his part to allow the relator to make the extended examination he demanded the opportunity of making, while not denying that he had so re-

fused, he answered, further, that he had never refused to relator, as a citizen of Memphis, "the right personally to inspect the books of the city in any reasonable manner, which this respondent has never denied to any citizen, but has at all times been ready to concede and accord [this] to all." We construe this to mean that he has not denied the right to make an examination for any special or particular matter. But, taking this in connection with other parts of the answer, we infer that the defendant did not consider as reasonable the demand made by the relator for a general examination, such as is claimed in the petition, and that the demand for such examination he did refuse.

Upon the subject of the motive and animus of the relator, after referring to the proposition for an examination made by the relator to the committee called by defendant, the answer proceeds: "Respondent states that the complainant is very hostile politically to him, and to the present city administration, and he believes that the design of the said proposition, made at the time it was, or the effect of it, was, or would be, not to promote and aid, but rather to impede and thwart, the objects and purposes had in view when said citizens were invited to meet to consider the subject of streets. Respondent, under the circumstances, regarded the proposition of complainant as an intended obstacle to what he was desiring to accomplish for the good of the city of Memphis, and did not accede to the demand."

After setting out the fact that he had addressed a

letter to certain well-known gentlmen in Memphis, asking them to consent to act as a committee to examine the books of the city, and that, upon their expressing a willingness to act, they had been appointed for that purpose and to perform that duty by the legislative council of the city of Memphis, the answer set forth the following correspondence that passed between the chairman of that committee, Mr. A. S. Caldwell, and the solicitors of the relator, as indicating and throwing light upon the motive and purposes of the relator in demanding the examination.

The first letter is as follows:

"Memphis, Tenn., Feb. 11, 1903

"Carroll, McKellar & Bullington and Caruthers Ewing, Attorneys for W. L. Wellford.

"Dear Sirs: I am instructed by the committee who have accepted Mayor Williams' invitation to supervise the examination of the city's books to address this communication to you and to make the same public.

"We call your attention to the letter of the mayor, dated February 10, 1903, published in the daily papers, which conferred upon us full authority to make this examination without any limitations whatever, and with the power to increase our membership. We accepted the mayor's invitation because we believed this work was a public duty we should not shirk.

"We desire the investigation to be made in a thorough and comprehensive manner, and under such supervision

that the report, when made, will command the respect
and confidence of the whole community.   We believe
that this can best be accomplished with the co-operation
of your client, and therefore suggest that all legal pro-
ceedings be dismissed, and that you select five prominent
citizens, irrespective of their business occupations, and
we will appoint them members of our committee.   If
desirable to further increase the committee, the new com-
mittee of ten may do so.

"If this proposal is accepted by you, it will not be nec-
essary for Mr. Wellford, or those interested with him,
to contribute any money toward the examination.   Our
sole object in making this proposal is a sincere desire to
obtain your co-operation, to the end that only one exam-
ination shall be made, and that by a committee repre-
senting all of the citizens of Memphis.   Will you kindly
let me hear from you by 11 o'clock tomorrow?

"By order of committee.

"ALBERT S. CALDWELL,

Chairman."

The reply to this is set forth in the answer as follows:

"Memphis, Tenn., Feb. 11, 1903.
"Mr. A. S. Caldwell, City.

"Dear Sir:   Referring to your call on yesterday, when
you requested that Mr. Wellford select five more mem-
bers to be added to your committee, and let the increased
committee of ten select accountants and examine the
books of the city, we wish to make the following sugges-

tion in lieu thereof: Mr. Wellford has put up his money and can close his contract at any time with accountants to examine the books.     We suppose that your committee has the funds and can do likewise.    Why not, then, simply let the accountants employed by your committee and those employed by Mr. Wellford get to work on the books and examine them?' In this way there will certainly be an examination of the books, concerning which no one can complain, and in which examination no one can be injured.

"We submitted the matter to our client, Mr. Wellford, who directs us to say that, the mayor having assumed such a hostile attitude toward him, he is now, in justice and fairness to himself, unwilling to take part in any examination of the city books unless he has the legal right to do so.

"Mr. Wellford directs us to say to your committee that we shall be glad to meet you in conference at any time.

> "Very truly yours,
> "CARROLL, McKELLAR & BULLINGTON,
> "CARUTHERS EWING."

The answer further avers that prior to the reception of this letter from the attorneys of Mr. Wellford, the aforesaid Mr. Albert S. Caldwell, as chairman of the committee of five, had addressed another communication to the said attorneys, and in reply thereto received the following:

"Memphis, Tenn., Feb. 12, 1903.
"Mr. A. S. Caldwell, Chairman, City.

"Dear Sir: After conferring with our client, Mr. Walker L. Wellford, we have concluded to accept for him your proposition that we select five prominent citizens, who, with the five gentlemen selected by the mayor, shall constitute a committee of investigation of the city's books and affairs, subject, however, to the following express conditions: The scope of the investigation to be conducted shall embrace the following:

"(1) A thorough and complete examination of all books, contracts, vouchers, and other documents in any way bearing on the conduct of the city's affairs during Mayor Williams' administration. The committee to be aided by such reputable expert accountants and other agents and employees as may be necessary, who shall be named by the five citizens selected by us.

"(2) A searching and exhaustive investigation, with a view of being able to report definitely as to: (1) The disposition of all taxes and revenues collected by the city. (2) The amount collected, and the methods employed in collecting money from gamblers and other violators of the law, and the disposition made of same. (3) Whether all persons appearing on the city's pay rolls rendered services to the city. (4) Whether improper influences have been brought to bear on any member of the city council for the purpose of securing franchises or other concessions; if so, specify same. (5) Whether relations between members of the city council

and corporations granted franchises or concessions have been entirely proper and legitimate.    (6)    Whether money has been borrowed, or direct or indirect benefits of any kind have been received by members of the city council, from such corporations or individuals granted franchises or privileges.    (7)    Whether any city official has been or is interested, directly or indirectly, in contracts awarded by the city for paving or other purposes.    (8)    Whether mayor or other member of the city council has used his position for personal profit. (9)    The relation of the mayor or any member of the city council, directly or indirectly, to gamblers, those selling liquors without license, and those who are permitted to carry on their business, though under the ban of the law.    (10)    Whether the city has received adequate compensation for its franchises, and whether it has received materials, services, etc., on reasonably fair terms, or whether considerations other than those of the best interests of the city have entered into such matters. (11)    Whether the affairs of the city during Mayor Williams' administration have been conducted in an honest, economical, and businesslike manner, or otherwise.    (12)    Whether the contracts, purchases, or sales made by the city during the present administration have been made in accordance with the law, after proper advertising, or whether any of such contracts, purchases, or sales have been made privately, or in any other way in violation of the law.

"(3)    That every member of the committee shall bind

State, ex rel., v. Williams.

himself to adopt such means and to employ such agencies as may be necessary to conduct a thorough and earnest investigation in accordance with this agreement, and to this end that any witnesses whose names may be suggested by three or more of the committee shall be summoned, and every member of the committee shall demand that said witness shall answer any and all questions that may be propounded by the committee bearing on the subjects of inquiry herein set forth, and a refusal to answer shall call forth the censure of the entire committee. That the money provided for the examination shall be used by the committee for the above purposes.

"That the chairman of the organized committee of ten shall be named by the five gentlemen selected by us.

"Having stated that you desire the investigation to be made in a thorough and conprehensive manner, and under such supervision that the report, when made, will command the respect and confidence of the whole community, we feel assured that you will accept the above conditions, by which alone in our opinion, this much desired result can be achieved. On receiving the unanimous approval of these terms, we will at once select the five gentlemen whom we wish to co-operate with the five appointed by the mayor, all of whom can then meet, organize, and proceed to business.

"Very truly yours,

"[Signed]     CARROLL, McKELLAR & BULLINGTON.
"CARUTHERS EWING."

To this letter the committee replied as follows:

"Memphis, Tenn., Feb. 12th, 1903.

"Messrs. Carroll, McKellar & Bullington and Caruthers Ewing, Attorneys for Walker L. Wellford.

"Dear Sirs: Your letter of Feby. 12th has been referred to my committee, and I am instructed to reply as follows: Your proposals that we shall have no voice in the selection of accountants and other agents and employees connected with the investigation, and that the chairman of the reorganized committee shall be selected by you, reflects such want of confidence in us that we can see but little hope for useful and harmonious action along the lines you suggest.

We are still of the opinion that the investigation should be impartial, and, as far as possible, free from public criticism; and to evidence our entire disinterestedness we now propose that you, and we jointly request Chancellor Heiskell to select a committee of five or ten, as in his judgment may seem best, to conduct this investigation. If you agree in this, we will join you in an immediate request to the chancellor to name this new committee, and upon its appointment we will tender to the city council our resignation, with a request that they appoint the chancellor's committee in our stead. Kindly give me an answer as early to-morrow as possible.

"Sincerely yours,

"[Signed] ALBERT S. CALDWELL,

"Chairman."

The answer avers: "Thus closed the repeated attempts of the city government and a committee of five to bring about the representation of all conflicting interests in an examination which should have been satisfactory to every citizen in the entire city of Memphis."

With respect to the selection of the committee whose chairman conducted the foregoing correspondence with the attorneys of the relator, the answer contains the following: "Respondent further states that, as complainant persisted in insisting on an investigation of the city's books by himself or others designated by him, without pursuing the course prescribed and authorized by law, this respondent, in order to satisfy any reasonable demands of the complainant, or the desires of any other citizens, addressed a communication to Messrs. M. S. Buckingham, J. A. Omberg, James Nathan, C. W. Schulte, and A. S. Caldwell, requesting that they take charge of the matter of the investigation of the city's books, and to have them thoroughly examined by bonded expert accountants. These gentlemen agreed to serve in the matter. The complainant objected to this, and was himself determined to have a hand in such examination.

"Respondent states that the above five named gentlemen are citizens of Memphis of the very highest character and standing in the community, socially and commercially, and are men of spotless reputation for fairness, honor, and integrity.

"Not one of them will suffer if a comparison is made between him and the complainant.

"Any work which they may agree to undertake will be honestly done, and the result would entirely satisfy the public at large."

The answer then sets out the correspondence between the gentlemen referred to and the defendant, Williams, the substance of which was an offer to appoint them a committee to make an examination and their acceptance. The answer then sets out a communication from the mayor to the legislative council, asking that body to ratify his action in appointing the committee, and a resolution of the council making such ratification of the appointment and organization of the committee for the purpose of conducting a fair, impartial, and thorough examination of the books of the city of Memphis by such means and in such manner as they may decide on, and appropriating $5,000 for the purpose.

The amended answer contains the following upon the same subject: "Respondent states that, since the filing of the answer on yesterday, February 18, 1903, the said committee reported to the board of police and fire commissioners that they had selected to do the said work the American Audit Company of New York, which is an institution of as high standing, character, and integrity, as any in America; and the board of fire and police commissioners approved of said selection and recommendation, and placed said audit company immediately in charge of the books, papers, and vouchers of the city for the purpose indicated, and it is now in charge and con-

trol of the same, in pursuance of the authority given said committee, by said city council.

"Respondent submits that there should be no interference with this work by either the complainant, respondent, or this honorable court.

"While respondent denies the right of the complainant to make such an examination as he had demanded of the books of the city through any agent he may appoint, and while respondent does not have the control of said books, yet so far as he is concerned, or is permitted to express his views, he states that he is perfectly willing that the complainant, Wellford, should select, or that the court should appoint, a competent bonded expert accountant to examine, check over, and verify the work of said American Audit Company, and he would be glad to have this done.

"Respondent believes that the legislative council of the city would not object to this, although he has no authority to speak for them. The matter, however, is entirely in charge of the aforesaid committee of five, and respondent cannot interfere with them, nor in any way speak for them; but he believes from their high character impartiality, and disinterestedness, that they would accede to any reasonable request made of them in the matter, to the end that the result shall be satisfactory."

The answer contains the following as further reasons why the relator has not a right to enforce a personal examination of the city's books on his part: "In addition to the lack of control of said books as already stated, re-

spondent states that it is provided by the ordinance of the city of Memphis how an examination of the books shall be made, and who has the right and authority to grant the same.

"The ordinance controlling this matter was passed as early as the year 1879, in the month of February, shortly after the city of Memphis under its present form of government was created, and years before this respondent held any official position in the city government.

"The ordinance is as follows: 'Every officer or agent of the city shall at all times, when requested, submit his books and official papers to the inspection of the mayor, or any member of the legislative council, or to any person or committee appointed or authorized by the legislative council to examine the same.' City Digest (Watkins' Edition), p. 168.

"Respondent avers that by this ordinance the mayor or any member of the legislative council may inspect the books, and that the legislative council of the city is vested with the sole and exclusive authority to determine when, where, how, and by whom examinations shall be made of the papers, books, and records of the city of Memphis; and therefore your respondent denies the right of the complainant to inspect, or to make copies of the records from the books of the city of Memphis, and this honorable court is without authority of law to grant or decree the same.

"Respondent would aver that it would cause a great deal of confusion, worry, and much inconvenience to

State, ex rel., v. Williams.

the business of the city of Memphis, and to the various officers of the said city and other employees, to allow any and every one, at their own whim and desire, to make a continuous examination of the books, vouchers, and papers of the city, as the various officers thereof and their deputies would be required to keep a close and careful supervision over any and all examinations of the books and vouchers constituting the public records of the city of Memphis. They involve transactions covering a period of five years, and many millions of dollars, and it would take at least five or six months to make a complete and thorough investigation of all of the affairs of the said city, during which period much valuable time would be lost by its employees and officers, public business would be interfered with, and the establishment of such a right would cause damage to the public service, and would place it within the power of the political enemies of the city administration, or any person, upon the least pretext and slightest suspicion, to demand and inaugurate examinations of the city's books, which examinations would impede the public service and impair the usefulness of the various departments of the city.

"With such possibilities confronting it, the city of Memphis, as set forth herein, in the year 1879, passed the ordinance hereinbefore referred to, in order to provide for and regulate such an examination as this complainant is now desiring at the hands of this honorable court.

"Respondent further states that, in addition to the said authority for and mode of examining the city's

books, under the law and ordinance aforesaid, the power to examine the books of all officials, State, county, and municipal, is vested by the law in the grand jury of Shelby county, which body has full power in the premises, not only to inspect and examine the papers, books, and records of the city officials, but also to summon witnesses and interrogate them, and examine and report upon the condition of the records of the city, and any wrongdoing or delinquency of this respondent, or any other official of the city of Memphis.

"Respondent submits that under the foregoing provisions of the law the complainant has no right to the inspection of the city records, as is claimed by him in his bill, in person and by his agents and employees, but that the grand jury of the county is the body designated by the law to perform this public service, and that it is their province and duty to act in the premises; and if they fail in this regard, or if any citizen or committee desire an investigation of any of the books of any official, the law prescribes that the legislative council, upon proper application to it, may have this done."

It was stated in the beginning of this opinion that the relator, upon the coming in of the answer to the alternative writ, had made demand for the peremptory writ. As a matter of fact, while this was in substance what was done, the form of the proceeding was different. The decree of the court below recites that the cause had been specially set down for hearing by the complainant, or petitioner, on the bill or petition and the answer of the

defendant, and was so heard.   The effect of such an or-
der would be, under our chancery rule, to treat every
fact properly set out and averred in the answer as
proven and as true.   So the same result is reached as
if the petitioner had formally demanded the peremptory
writ, upon the coming in of the aforesaid answer to the
alternative writ; the latter act, as already stated, being
equivalent to a demurrer to the said answer or return.

It results that we must treat every averment of fact
in the answer, for the purposes of the present hearing,
as true, and, after consideration thereof, either grant or
deny the peremptory writ.

Turning to the legal questions involved, we shall first
consider whether the relator, as one of the corporators
of the municipality, has the right to make the general
examination he asks for in the petition.

Several authorities have been cited to us by the coun-
sel for the respective parties.

For the petitioner we are cited to *Herbert* v. *Ashburn-
er,* 1 Wilson, 297; *King* v. *Babb,* 3 Term Rep., 582; *Rex*
v. *Guardians of Great Farrington,* 9 B. & C., 541, and
other authorities which will be presently stated.

In *Herbert* v. *Ashburner* there was a rule made to
show cause why the defendant should not have the lib-
erty of inspecting the books of the session of the corpor-
ation of Kindale.   It was objected that the party was
not entitled to see the books, unless he could show to the
court by affidavit that they contained matters relating

110 Tenn—37

to the thing in question, which was whether certain park lands were within the town or corporation of Kindale. Upon this matter the court said: "These are public books which everybody has the right to see." The rule was thereupon made absolute, without more.

In *King* v. *Babb,* when a rule had been granted for an information in the nature of a *quo warranto* against A, to show by what authority he claimed to be mayor of G, on the relation of some of the corporators, and another rule in that cause for inspecting all the corporation books, papers, etc., directed to the town clerk, and an inspection of such only as related to the election and office of mayor, was held to be a sufficient compliance with the latter rule, so as to protect the town clerk from an attachment as for a contempt of the court; it appearing that he had acted *bona fide.* But Lord Kenyon, in that case in rendering judgment, assumed "that in certain cases the members of the corporation may be permitted to inspect all papers relating to the corporation."

In *Rex* v. *Guardians,* etc., of *Great Farrington,* 9 B. & C., 541, it was held that a rated parishioner had a right to inspect the accounts of the expenditure of the parish moneys, kept by the guardians for the poor, appointed under 22 Geo. II., c. 83, and the court granted a mandamus to the guardians, etc., commanding them to allow such inspection.

In Glover on Municipal Corporations, 262, it is said: "Every corporator has the right to inspect all records, books, and other documents of the corporation upon all

State, ex rel., v. Williams.

proper occasions, and if, upon application, an officer who is interested refuses to show them, the court will grant a mandamus to enforce his rights."

In Dillon on Municipal Corporations, section 303, it is said:     "The following points have been ruled and stated by Mr. Wilcox: 'Every municipal corporator has the right to inspect all the records, books, and other documents of the corporation on all proper occasions; and if, upon application for that purpose, the officer who has the custody refuses to show them, the court will grant mandamus to enforce his right.' " Again the same author says in section 848:     "In this country the records, books and by-laws of a municipal corporation are of a public nature, and if such corporation should refuse to give inspection thereof to any person having an interest therein, or perhaps for any purpose, to any inhabitant of the corporation, whether he has any special or private interest, or not, a writ of mandamus will lie to command the corporation to allow such inspection, and copies to be taken under reasonable precautions to secure the originals."

The relator also referred to *People, ex rel.,* v. *Chas. B. Cornell,* 47 Barb., 329, not as an authority (because the decree in that case was subsequently reversed by the Court of Appeals, without any written opinion, however), but for the benefit of its reasoning.     In the course of his opinion in that case, Mr. Justice Barnard in part said:     "Upon the argument, I was strongly of the opinion that such corporator had such right, and subsequent

reflection and investigation have confirmed that opinion. It was claimed, and strongly insisted upon in the argument, that the corporator had the right to inspect such records only when he had some private interest for the information and protection of which the inspection of said document was necessary, and that then this inspection must be limited to those documents, and it was claimed that this rule was established by English decisions.    I have examined the English authorities referred to in the argument, and such as I have been able to discover in the books, and I think that none of them so restrict the right of inspection, while many of them distinctly hold the right of a general inspection.    And again, I see no principle upon which it can be held that the corporator has not the right to a general inspection of the public records.    It is true that the whole body of incorporators acting through their legally constituted representatives, as well perhaps as the legislature under which the corporation holds its charter, may make laws and ordinances restricting the right of general inspection; but unless there is such restriction, I am unable to see any principle upon which it can be held that a corporator has not the right to a general inspection of the public records of the corporation.    In the language of the court in *Herbert* v. *Ashburner.*  'These are public books, which everybody has a right to see.'    And, again, the citizens within the corporate limits constitute the corporation, while the mayor, aldermen, common council, street commissioner, and others, are its officers and

agents, to whom are confided, under certain restrictions, the care and management of the property, business, and interests of the corporation. If, from the bare fact that corporations can only act through officers or agents, and that, therefore, officers are appointed to whom the care of the property, business, and interest of the corporation are intrusted, and who are subject to removal before the time for which they are appointed has expired, and who are also subject, on the expiration of their terms, to be replaced by others at the will of the corporators, it results that, immediately upon the appointment of such officers, the corporators have no longer interest in the manner in which their property, business, and interest are cared for, conducted, and looked after by their agents, then also follows that the corporators have no right to inspect the books and papers in the custody of the officers relating to their official business.

"If, however, the corporators, notwithstanding the appointment of such officers, still retain an interest in the manner in which their property, business, and interests are cared for, conducted, and looked after, then it follows that they are entitled to have as full knowledge of all the official acts of their officers as the officers themselves have, so as to enable them to ascertain whether their officers have performed their duty in such manner as is acceptable to them, with the view to determining whether they will continue them in office or not."

In that case it appeared that the relator was a citizen of New York, and that the defendant was an officer of

the corporation, being the head of the street department and the street commissioner. The affidavit, among other things upon which the application was founded, set forth that the defendant, as such street commissioner had in his custody certain contracts for various public works done under his direction, and certain vouchers pertaining to the payment of public moneys of the corporation, made out for such works; that the relator had the right, as a member of the corporation, to see and inspect all such contracts and vouchers, and that it was the duty of the defendant to exhibit them to any member of the corporation; and that the relator had applied to the defendant in August, 1866, for permission to see such documents, and had been refused. It was held under the foregoing opinion, that the relator was entitled to the inspection he asked, and had the right to make such copies of the record as he desired, and accordingly a peremptory writ of mandamus was awarded him. As before stated, however, the decree in this case was reversed in the court of appeals; but, no opinion having been handed down, we do not know what the ground of reversal was.

The relator refers to certain other cases—*Rex* v. *Shelley,* 7 Term Rep., 746; *Rogers* v. *Jones,* 5 D. & R., 484; *King* v. *Lucas,* 10 *East.,* 235; *King* v. *Allgood,* 4 M. & S., 162—which indeed are referred to in some of the text-books above mentioned; but they do not seem to bear, in strictness, on the point we now have under ex-

amination, referring, as they do, only to the inspection of court rolls or records.

. The defendant replies the American cases bearing substantially upon the same class of records, or similar ones. He refers to *Buck* v. *Collins,* 51 Ga., 391. It appears that the complainant there insisted upon the legal right to go into the office of the clerk of the supreme court, who was also the register of deeds, and make from the books an abstract of them. As he did not need the aid of the clerks, he insisted that he was entitled to do this without paying any fees. Section 14 of the Code of Georgia declares that all books kept by any public officer shall be subject to the inspection of all citizens of the State, within office hours, every day except Sunday. The fee bill provides fees for inspection and abstracts as follows: For such inspection when the clerk's aid is required, 25 cents, and for examination of books and abstracts of result, $1. Under this law the complainant insisted that he had a right to go into the clerk's office, during office hours, from day to day and from month to month, at his pleasure, and copy from the books when they were not in use, and thus collect material for a book which he proposed to publish for sale. As he was able, by employing experts, to do this inspection and compilation himself, without the assistance of the clerk, he insisted that no fee was required, and, as the clerk refused to allow him to go on, except upon the payment of a fee for each separate investigation of the title, he prayed that the clerk might be enjoined.

To the same effect, in substance, was cited, also, the cases of *Webber* v. *Townley,* 43 Mich., 538, 539, 5 N. W., 971, and *Bean* v. *People,* 7 Colo., 201, 2 Pac., 909.   They are cited by the defendant as supporting the general proposition that neither at common law nor by statute is the duty imposed upon the custodian of public records to allow continuing and permanent inspection and use of the books; that he is not bound to give so much of his time as would be required to watch the books while thus continuously examined and used; and that he is not bound to intrust them to persons who desire to so inspect and use them, and who require no aid from him in doing so.   These cases are also cited as raising the objection that the same right of inspection, whatever it may be, exists without regard to the character of the applicant.

Both sides quote from High on Ex. Leg. Rem., sec. 330, as follows:   "Upon principles analogous to those already considered, the courts interfere by mandamus to compel municipal authorities to allow inspection of their records by persons entitled thereto, and the writ will be granted, in behalf of a member of a municipality who is entitled to the inspection of its books, to permit him to make such inspection and to take copies and abstracts of the record at his own cost.   It is, of course, essential to the exercises of the jurisdiction in such cases that the relator should show some interest in the records which he seeks to inspect, and it may well be doubted whether the writ would in any case be allowed upon the relation of a mere stranger.   But a resident within a

municipality, who has been sued by the corporation for a violation of one of its by-laws, is entitled to the aid of a mandamus to procure an inspection of the books of the corporation, so far as they relate to the matter in dispute, and to compel the clerk of the corporation to furnish his copies of the by-laws at his expense." The complainant relies for authority upon the first sentence of the excerpt, and the defendant upon what follows.

Both sides seek support in the cases which refer to the examination of the books of corporations other than municipal bodies. Among other cases, the relator refers to Matter of Steinway, 159 N. Y., 250, 53 N. E., 1103, 45 L. R. A., 461, and our own case of *Deaderick* v. *Wilson,* 8 Baxt., 108, and to the following text-books: 4 Thompson on Corporations, sec. 4406; Morawetz on Corporations, sec. 473; 2 Cook on Stock and Stockholders, sec. 511. The defendant cites: *Reg.* v. *Mariquita Min. Co.,* 1 El. & El., 289; *Commonwealth* v. *Iron. Co.,* 105 Pa., 111, 51 Am. Rep., 184; *Rex* v. *Merchant's Taylor Co.,* 2 B. & Ad., 115; *Railroad Co.* v. *White,* 1 L. B., 282; *Imp. Gas Co.* v. *Clark,* 7 Bing., 95; *Hoyt* v. *Bank,* 1 Duer, 652; and other cases. Also the following text-books: 19 A. & E. Ency. Law, 231-233; Taylor on Evidence, sec. 1495.

We shall not undertake an examination of the cases. The conflict of opinion upon the subject will sufficiently appear from a few excerpts made from some of the text-books referred to.

In Morawetz on Corporations, sec. 473, it is said:

"The members of a simple copartnership are entitled to examine the partnership books and accounts whenever they desire; but this rule is inapplicable to large joint-stock companies and corporations. The control over the affairs of associations of this description is, by common consent, delegated to directors and managing agents elected by the majority, and individual shareholders have no authority or control, except by their votes at shareholder's meetings. If every shareholder in a large joint-stock association were allowed to examine its books and accounts at pleasure, it would become impossible, in practice, to keep the books in a proper manner. Moreover, it is evident that the result would be to lay open the affairs of the company to the public, and render any privacy in its dealings impossible [citing *Reg.* v. *Mariquita Min. Co.,* 1 El. & El., 289; *Rex* v. *Merchant's Taylor Co.,* 2 B. & A., 115; *Rex* v. *Hostman,* 2 Strange, 1223; *Mayor of Southampton* v. *Graves,* 8 T. R., 590]. It is reasonable, however, that the majority of the company should have the power to examine its books and accounts, through agents appointed for that purpose at a meeting duly convened.

"However in the United States, the prevailing doctrine appears to be that the individual shareholders in corporations have the same right as the members of an ordinary partnership to examine their company's books, although they have no power to interfere with the company's management. The supreme court of Pennsylvania said: 'Unless the charter provides otherwise, a

shareholder in a trading corporation has the right to inspect its books and papers, and to take minutes from them for a definite purpose at reasonable times. The doctrine of the law is that the books and papers of the corporation, though of necessity kept in some one hand, are the common property of all stockholders' [citing *Com.* v. *Phoenix Iron Co.,* 105 Pa., 111-116, 51 Am. Rep., 184; *Cockburn* v. *Union Bank,* 13 La. Ann., 289; *Deaderick* v. *Wilson,* 8 Baxt., 108; *State* v. *Einstein,* 46 N. J. Law, 479; *Union Nat. Bank* v. *Hunt,* 76 Mo., 439; *Wannell* v. *Kem,* 57 Mo., 478; *People* v. *N. P. R. R. Co.,* 50 N. Y. Super. Ct., 456]."

In Thompson on Corporations, sec. 4418, after citing several cases that confined the right to inspect to a case with reference to some defined, distinct dispute, as to which it appeared that it might be to his advantage to see the minutes of the corporation, all of them English cases except one (*Com.* v. *Phoenix Iron Co.,* supra), he adds: "It should be carefully added, however, that this theory has gained no considerable footing in America, nor is it based upon any foundation of sense. Subject to the convenience of the others, or of the common agency, which acts for all, it is the right of every proprietor to know how the business in which he has embarked his money is being carried on, whether there is and dispute about it or not."

In Cook on Stock and Stockholders, on the other hand, after stating (section 511) that the stockholders of a corporation had, at common law, a right to examine at

any reasonable time any one or all of the books or records of the corporation, and that this rule grew out of an analogous rule applicable to public corporations and to ordinary copartnerships, "the books of which, by well-established laws, are always opened to the inspection of members," he adds, in section 515, that, "in order to justify the granting of a mandamus, either the property, or some property right, of the stockholder must be involved, or some controversy exist, or some specific or valuable interest be in question, to settle which an inspection of the corporate records becomes necessary."

Passing from this conflict, it is said, in section 4419 of Thompson's work, that the right of a shareholder to inspect the books of a corporation will not be enforced for speculative purposes or the gratification of curiosity. It is also said, in section 4422, that it is no answer to an application to inspect that it is inconvenient to grant the right. Individual shareholders cannot, of course, appropriate the books of a corporation for the purpose of inspecting them to an unreasonable extent, and to the detriment of the interests of the corporation and the rights of other shareholders. But, the right of a shareholder to such an inspection being clear, it is not a sound view that the corporation can deny it upon the mere plea that it would be inconvenient to grant it. The convenience of the corporation and the convenience of the shareholder must to some extent yield to each other, and the law will not permit either, in the exercise of its rights, to act unreasonably toward the other. The stock-

holder must make the inspection in a peaceful manner. Section 4424. But he may exercise the right of inspection through an agent, attorney, or expert. Section 4426. And he has the right to make copies and extracts. Section 4421.

The court may control the manner of the inspection. But it is not always a matter of course for the court to grant the inspection when applied to. In section 4427 will be found numerous examples or instances in which inspection was granted, while in section 4428 will be found numerous other instances where the mandamus was refused.

Upon this subject the following from Cook on Stock and Stockholders is appropriate: "The writ of mandamus, however, does not issue herein as a matter of course. It is an extraordinary remedy, to be invoked only upon special occasions. The court does not grant the mandamus until it has taken into careful consideration all the facts and circumstances of the case. The condition and character of the books, the reason for refusal by the corporation, the specific purpose of the stockholder in demanding inspection, the general reasonableness of the request, and the effect on the orderly transaction of the corporate business in case it is granted, are all considered in granting or refusing the writ. It is granted only in furtherance of essential justice."

Passing, for the present, the question as to who is the true custodian of the books of the city, we shall now consider some of the other reasons given in the answer of the defendant, or his return, to the alternative writ.

We do not think it material that there is an ordinance which provides that "every officer and agent of the city shall at all times when requested, submit his books and official papers to the inspection of the mayor, or any member of the legislative council, or to any person or committee appointed or authorized by said legislative council to examine same." This provision is not exclusive, nor are we prepared to admit, as intimated in *People* v. *Cornell,* supra, that the city authorities could, through a by-law, cut off the right of a corporator to make an examination on suitable occasions.

It is likewise immaterial that the grand jury has the right to make an examination. This right is not exclusive. Moreover, such examination is nearly always cursory and wholly inadequate.

Nor is it a sufficient reply that the applicant is politically hostile to the custodian of the papers, unless it appear that the examination he asks is sought with the corrupt purpose of merely furthering such animosity. If it appear that the examination is sought for an honest and laudable purpose, the personal antagonism of the parties will not be sufficient ground upon which to deny the right. It should not be granted, however, for any political or other improper purpose.

Nor is it a sufficient reply that such an examination could produce worry and inconvenience, nor that the transactions to be examined are numerous and involve many millions of dollars. The inconvenience and obstruction to business can be very modified by the order

of the court prescribing the method of examination, and the court's reserving the right to make additional orders from time to time as occasion therefor may appear; and, indeed, that the objections referred to in this paragraph are not insuperable is shown by the fact that the defendant felt able to overcome them in making a way for such examination by the committee over which Albert S. Caldwell was named as chairman.

Before going further, we shall determine the question whether there is enough set forth in the answer, taken in connection with the admissions made, under the forms of the pleadings, of certain allegations in the bill or petitions, to show that the relator is actuated by a fraudulent and dishonest purpose. It appears that when the relator made his application the defendant had already called together the committee of two hundred, and had made known the fact that the city was badly in need of money to take care of the streets and was without funds for that purpose. The committee was convened for the purpose of devising ways and means to meet the city's needs. Under these circumstances it was natural that a citizen and taxpayer should desire to know the exact condition of the city's finances, and the plan of a thorough and exhaustive examination necessarily arose in the mind. The purpose he professed was to ascertain the real condition of affairs, how much money had come in, and where it had gone to, as a necessary preliminary to fiscal ameliorations. The defendant does not aver in terms that the present proceeding was instituted for a fraudulent

and corrupt purpose, nor, indeed, would mere opinions prevail; but he states that he refused the request because he believed that the proposition was made rather to impede and thwart the object had in view by calling the committee of citizens together, than to forward such object. This is, at most, but the mere expression of an opinion and, besides, refers to the proposition made by the committee. The correspondence that passed between the counsel for the relator and the chairman of the Caldwell committee was merely an attempt at an adjustment, and, while it manifests a very persistent purpose to obtain leave to make examination, if possible, it contains no word of vituperation or anything indicating malice.

We pass, now, to a statement of our conclusions upon the general question of law as to the right of a citizen and taxpayer of a city to make an examination of the books and papers of the city. In stating these conclusions we shall not discuss the authorities above referred to, or attempt to reconcile their conflicts. After considering all of these authorities and the whole subject involved, we shall state what we believe to be the sound principles applicable to the matter.

In theory the right of examination is absolute, but in practice it is at last only a matter of discretion, because such application is likely at any time to be refused on the part of the custodian of the books and papers sought to be examined, and then the right must be enforced by mandamus, and this writ is not of absolute right, but merely of discretion, to be awarded only in a proper

case; the facts claimed as authorizing its issuance to be judged of in every case by the court, and the writ to be awarded or withheld upon a consideration of all the circumstances presented. So, while the right is, in theory, absolute, yet it is in practice so limited by the remedy necessary for its enforcement as that it can be denominated only a "qualified right."

The right to an examination for a special purpose, as, for example, to obtain specific information to use in a litigation between the applicant and third parties, or between the applicant and the corporation, and the like cases, while not, in principle, standing upon higher grounds, yet is the more easily grantable, because it does not involve so much time, and so much inconvenience to the custodian of the books and papers, and so much interruption of business, as in case of a general examination.

Yet it cannot be doubted, under a state of facts showing it to be important to the public interest that the general examination of the books of a municipality should be had, that the court should allow such examination at the suit of one who is a citizen and taxpayer of the corporation.

The right rests, not only on the ground that the books are public books, but also on the same principle that authorizes a taxpayer to enjoin the enforcement of illegal contracts entered into by the municipality, county, or State, for the protection of the applicant and all other taxpayers from illegal burdens. And it is

110 Tenn—38

obvious that, in making and enforcing such application, the taxpayer acts, in a very real sense, not only for himself, but for all other taxpayers, and acts, therefore, in the capacity, as it were, of a trustee for all.

It must be admitted, also, that the exercise of such power, if prudently and carefully guarded, can not be otherwise than salutary, because the knowledge that it can be exercised by a citizen and taxpayer, and may be exercised when the public good shall seem, on sound reasons, to demand it, cannot result otherwise than in producing an added sense of responsibility in those who administer the affairs of municipal corporations and in inducing a greater carefulness in the discharge of the trusts imposed upon them by their fellow citizens under the sanctions of law.

Yet it is equally true that such general examinations must necessarily to some extent interrupt the ordinary and usual course of business in public offices, and require of the officers in charge thereof some additional duties for the time being. And it follows, from this, that such examinations should not be lightly granted, or permitted with unnecessary frequency; that the occasion should be grave and important; and that the person seeking the examination should be trustworthy and reliable, and at all times and at every stage subject to the supervision of the court, to the end that there may be no oppression practiced under the guise of doing service to the public, and that the safety of the books and records subjected to the examination shall be continu-

ally provided for.  All of these matters fall within the principle that the granting of permission to make the examination rests in the sound discretion of the court, in the form of granting or withholding the writ of mandamus.

It only remains to determine whether the occasion shown in the present case is of sufficient gravity to move the discretion of the court.

The case presented, as drawn from the petition and answer, is that the period of the examination sought covers the space of five years, during which time many millions of dollars have been collected by the city administration and expended; that during 1902 there were receipts to the amount of $1,067,916.09 and disbursements to the amount of $1,060,053.89, and the city borrowed from one bank $53,357.04, on which $3,172.36 was paid, from another bank $52,135.43, on which $2,982.17 interest was paid, and from another bank $22,922.33, on which, $552.99 interest was paid, aggregating $135,122.32, and that during the previous year there was borrowed $101,361; that the taxes collected from year to year from the taxpayers of the city are already very heavy and very burdensome; and that the mayor, notwithstanding the great revenues collected, a liberal exercise of the power to borrow money, and the recent session of the legislature, to which application could have been made for an increase of the means of raising taxes, if the property of the city could bear more, found it necessary, shortly before the petition was filed, to resort

to the extraordinary expedient of calling a meeting of two hundred prominent citizens of Memphis to devise ways and means to pave, repair, and "round up" the streets of the city.

Under such a state of facts, we think it not unnatural, and not unreasonable, that the taxpayers of the city should desire to have the books, papers, and vouchers of the city looked into, to the end that they may fully learn the financial condition of the municipality; and we think the facts stated make a case sufficient to justify the court in allowing the general examination sought in the petition.

Indeed the conclusion as to the propriety of making such general examination is substantially conceded in the answer of the defendant, in the fact that he replies that he has set on foot just such examination, through a committee of citizens selected by him and agreed to by the legislative council.

However, the creation of that committee can in no wise interfere with the present proceeding. After judicial proceedings have been started, as in the present case, for the purpose of obtaining a general examination, they cannot be thwarted by the appointment of a committee on the part of the custodian of the books, or his associates in authority, to make an examination in lieu of the one sought. The right of the petitioner to have his application passed upon on its merits became complete upon the filing of the petition, and, of course, cannot be affected by subsequent acts of the defendant,

State, ex rel., v. Williams.

taken without his consent, and to which he was not a party. It follows that the writ must be allowed, if the defendant is the custodian of the books and papers of the city in such a sense that he can be justly called upon to produce them.

Upon examination of the laws governing the city, and the rights and power of its mayor—as shown in Watkins' Digest (1902), pp. 19, 20, secs. 4 and 6; Id., p. 22, secs. 1, 2; Id., p. 170, art. 5—we think sufficient powers are vested in the mayor to make it proper that the writ should go against him for the allowance of the examination sought in the petition and for the production of the books and papers.

It results that the decree of the chancellor must be reversed, and the cause remanded for the entry of a decree awarding the peremptory writ; but such decree shall reserve to the court below the powers and control above indicated to prevent oppression, and for the preservation of the books and papers, and to so order the examination as to interfere as little as practicable with the transaction of current business, and said decree shall reserve to each party the right from time to time to apply to the court for instructions pending the examination.