STATE of Tennessee, on the Relation of James P. COLE and Charles C. Thompson, II, Plaintiffs-Appellants,

v.

Jerry T. FRANCISCO, M.D., Shelby County Medical Examiner and Hugh W. Stanton, District Attorney General, Defendants-Appellees.

Supreme Court of Tennessee.

Dec. 13, 1982.

Michael F. Pleasants, Charles C. Harrell, Memphis, for plaintiffs-appellants; Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, of counsel.

Carroll C. Johnson, Asst. Shelby County Atty., Memphis, Frank J. Scanlon, Asst. Atty. Gen., for defendants-appellees; William M. Leech, Jr., Atty. Gen., Nashville, of counsel.

## OPINION

BROCK, Justice.

This is a mandamus action brought by relators, who are professional journalists employed by the ABC television news magazine "20/20," against Dr. Jerry T. Francisco, the Shelby County Medical Examiner,

praying that he be required to make available to them "the complete pharmacological, toxicological and autopsy reports utilized by him in preparing his Report of Official Medical Examination" of the death of Elvis Presley who died in Shelby County, Tennessee, on August 16, 1977. The case was determined on the pleadings and the depositions and affidavits on file, pursuant to a motion by relators "for submission of cause upon the record and for findings by the court pursuant to Rule 52 of the Tennessee Rules of Civil Procedure."

The Chancellor decided the case in favor of the defendants and entered a final decree dismissing the complaint; he adopted as his findings of fact the contents of a "designation of record" filed by relators which summarizes excerpts of the testimony of various witnesses who had given depositions or affidavits; and, as a combination of findings of fact and conclusions of law, the Chancellor adopted the memorandum or brief filed by counsel for defendant, Dr. Jerry T. Francisco, in aid of the answer filed on behalf of Dr. Francisco.

## II

■ In addition to the relief sought against Dr. Francisco the relators also sought to require the District Attorney General, Hugh Stanton, to intervene in this action as a party plaintiff. It is well settled that a mandamus action against a public official will lie only to require performance of a ministerial nondiscretionary act of the official. The law of this state does not require that the District Attorney General bring a mandamus action upon the simple request of a private citizen. The decision whether or not to initiate a mandamus action against another public official is in the sound discretion of the District Attorney and there is no evidence here to indicate that the District Attorney abused his discretion by refusing to bring suit. *See Sachs v. Shelby County Election Commission,* Tenn., 525 S.W.2d 672 (1975); *Seagle-Paddock Pools of Memphis, Inc. v. Benson,* Tenn., 503 S.W.2d 93 (1973). The judgment of the Chancellor in this respect is, therefore, affirmed.

## III

At about 2:30 p.m. on August 16, 1977, the famous entertainer, Elvis Presley, was found lying on the floor of the bathroom of his home by his companion, Ginger Alden. Calls went out immediately to Mr. Presley's personal physician, Dr. George Nichopoulous, and to the fire department for an ambulance. Accompanied by Dr. Nichopoulous, Mr. Presley's body was taken in an ambulance to the emergency room of Baptist Memorial Hospital in Memphis where he was pronounced dead upon arrival. Dr. Nichopoulous soon thereafter returned to the Presley home and obtained from Mr. Vernon Presley, father of the deceased, a written consent for the performance of an autopsy upon Elvis Presley's body. Dr. E. Eric Muirhead, Director of the Pathology Department of the hospital, immediately contacted Dr. Francisco, the Shelby County Medical Examiner, to inform him of Mr. Presley's death, as was Dr. Muirhead's duty under T.C.A., § 38–708, which provides:

"Any physician, undertaker, law enforcement officer, or other person having knowledge of the death of any person from sudden violence or by casualty or by suicide, or suddenly when in apparent health, or when found dead, or in prison, or in any suspicious, unusual, or unnatural manner, or where the body is to be cremated shall immediately notify the county medical examiner or the district attorney general, the local police, or the county sheriff, who in turn shall notify the county medical examiner.

"Whenever a death occurs under the circumstances as set forth in this chapter, the body shall not be removed from its position or location without authorization by the county medical examiner, except to preserve the body from loss or destruction or to maintain the flow of traffic on a highway, railroad, or airport. No body subject to post mortem examination as provided by this chapter shall be embalmed without authorization by the county medical examiner."

Upon receipt of notice of Mr. Presley's death from Dr. Muirhead, it became the duty of Dr. Francisco, as county medical examiner, to perform certain acts as provided in T.C.A., § 38–709:

"When a death is reported as provided in § 38–708, it shall be the duty of the county medical examiner to immediately make an investigation of the circumstances of the death and record his findings in quadruplicate on a form provided by the division of post mortem examination for this purpose, send one (1) copy to the county coroner, send one (1) copy to the chief medical examiner, keep one (1) copy for his files, and present one (1) copy to the district attorney general if there is evidence of foul play and/or if in his judgment an autopsy should be performed. In any event, the county medical examiner is authorized to remove from the body of the deceased a specimen of blood or other body fluids, or bullets or other foreign objects, in lieu of performing an autopsy, if in his judgment these procedures are justified in order to complete his investigation.

"When an autopsy is ordered by the district attorney general, the county medical examiner shall notify the chief medical examiner and the county medical examiner shall designate and authorize a pathologist to perform the autopsy as provided in § 38–705. The person who performs the autopsy shall report his findings in triplicate submitting one (1) copy to the division of post mortem examination, one (1) copy to the district attorney general and one (1) copy to the county medical examiner. Nothing in this chapter shall be construed as interfering with, limiting or restricting the present powers of the coroner to hold an inquest as provided by law. However, no inquest shall interfere with the provisions of this chapter."

Also pertinent here are the provisions of T.C.A., § 38–706, authorizing official autopsies as follows:

"The district attorneys general are hereby given authority to order an autopsy only in those cases involving homicides or suspected homicides when recommended by the county coroner and the county medical examiner on the body of any person whose death occurs under the circumstances as outlined by this chapter. It shall be the duty of the district attorney general to notify the next of kin of the deceased, when known or reasonably ascertainable, of the impending autopsy. Process containing such notice shall be served and returned within twenty-four (24) hours. The autopsy shall be performed as soon as the return is received; provided if no return is received within twenty-four (24) hours, the autopsy shall be performed forthwith."[1]

Thus, the legislative machinery authorizing official autopsies may be summarized as follows:

(1) Any person having knowledge of the death of another person "from sudden violence or by casualty or by suicide, or suddenly when in apparent health, or when found dead, or in prison, or in any suspicious, unusual, or unnatural manner, or where the body is to be cremated" shall immediately notify the county medical examiner;

(2) Upon receipt of notice of such a death, the county medical examiner shall "immediately make an investigation of the circumstances of the death and record his findings in quadruplicate on a form provided by the division of post mortem examination for this purpose, send one copy to the county coroner, send one copy to the chief medical examiner, keep one copy for its files, and present one copy to the district attorney general if there is evidence of foul play and/or if in his judgment an autopsy should be performed. In any event, the county medical examiner is authorized to remove from the body of the deceased a

---

1. Autopsies may also be authorized by the criminal court upon application of the district attorney general, T.C.A., § 38–604.

specimen of blood or other body fluids, or bullets or other foreign objects, in lieu of performing an autopsy, if in his judgment these procedures are justified in order to complete his investigation";

(3) If an autopsy is ordered by the district attorney general as provided by T.C.A., § 38–706, the county medical examiner shall notify the chief medical examiner and shall designate and authorize a pathologist to perform the autopsy as provided in T.C.A., § 38–705;

(4) The pathologist who performs the autopsy thus authorized shall report his findings in triplicate, submitting one copy to the division of post mortem examination, one copy to the district attorney general and one copy to the county medical examiner.

Mindful of the foregoing statutory provisions, we proceed to examine the dispute in the instant case. Dr. Francisco's defense is based upon two grounds: (1) he does not have in his possession, actually or constructively, the autopsy report or the toxicological reports demanded by relators and (2) he was under no duty to acquire and keep in his possession the reports demanded because he was not ordered by the District Attorney General to conduct an autopsy and the autopsy that was performed was not conducted as an official autopsy under the statutes above quoted.

Soon after Mr. Presley's body was taken to the hospital, it was agreed between the defendant, Dr. Francisco, as county medical examiner, Dr. Nichopoulous, who was Mr. Presley's personal physician, and Dr. Muirhead and other staff physicians of Baptist Memorial Hospital that the autopsy which had been authorized by Mr. Presley's father would be conducted at the hospital rather than at the facilities of the county medical examiner which were across the street from the hospital, the chief impetus for this decision being the fear that an attempt to remove the body from the hospital to the county medical examiner's facilities would provoke undesirable behavior on the part of hundreds of mourners and onlookers who had gathered outside the emergency room of the hospital. The autopsy proceeded and was conducted primarily by personnel of the hospital although Dr. Francisco and his assistants participated therein to some extent. Certain samples of blood, fluids and body tissue were removed during the autopsy and forwarded to various laboratories about the country for toxicological investigation and reports from these investigations were not all received by the hospital authorities until sometime in October, 1977. When all reports had been collected and collated they, along with the autopsy report which had been prepared by the hospital authorities, were made available for the inspection of Dr. Francisco and his assistants with the distinct understanding and agreement that he was not to copy any portion of the same and, upon completion of his review, was to return all such reports to the hospital authorities. The testimony in the record is that Dr. Francisco abided by this agreement, reviewed the autopsy and toxicological reports for the purpose of completing his report as county medical examiner and the death certificate and then returned these reports to the hospital authorities from whom he had received them. According to the record, he does not now have in his possession or under his control all or any part of these reports. He does have in his possession copies of "Report of County Medical Examiner" and the "Certificate of Death" relating to Mr. Presley's death and he has made these available to the relators.

▪ T.C.A., § 38–710, provides: "The reports of the county medical examiners, toxicological reports, and autopsy reports shall be public documents." Obviously, this applies only to the official reports authorized or required by law to be kept by public officials, not to such reports as may be kept by unofficial parties.

▪ Mandamus may be employed to require a public official to produce for inspection a public record that is in his custody. *State v. Williams,* 110 Tenn. 549, 75 S.W. 948, 64 L.R.A. 418 (1903). The plaintiff-re-

lator in such an action must establish (1) that the record or document is a public record, i.e. one that members of the public including the plaintiff have the right to inspect, and (2) that the defendant official has the record in his custody, actually or constructively, i.e. the official has a positive duty to keep the record in his custody and it is possible for him to obtain actual custody of it.

Factual impossibility of performance is a defense to mandamus. *Lamm v. Barber,* 192 Colo. 511, 565 P.2d 538, 544 (1977). We hold that the record here fails to show that the defendant Dr. Francisco has in his custody the reports sought to be produced. Such is the Chancellor's finding and it is supported by the testimony of the defendant and other witnesses. Moreover, we hold that the defendant was under no duty to acquire and keep in his custody the demanded reports. No official autopsy was performed; the District Attorney General did not order one. The autopsy that was performed was authorized by the father of the deceased and, insofar as is disclosed by the record before us, was the private project of the family. The defendant had no duty to acquire or keep in his custody the reports that were made of such a private autopsy. The fact that he obtained certain information from the reports of such a private autopsy does not transform those private reports into public documents. Defendant has made available to relators the record that he was required to make by T.C.A., § 38–709; in the circumstances of this case, he was required to do no more.

The decree of the trial court is affirmed. Costs incurred on appeal are taxed against appellants and surety.

COOPER, HARBISON, DROWOTA, JJ., and TATUM, Special Judge, concur.