## Harris v. State, ex rel.

### (*Nashville.*  March 21, 1896.)

1. **Mandamus.** *Maintainable by State Board of Examiners of railroad assessments, when.*

   The State officials—viz.: Governor, Treasurer, and Secretary of State—composing the State Board of Examiners of assessments of the distributable property of railroads, may, as relators, maintain mandamus, in the name of the State, against the State Comptroller and the members of the State Board of Assessors and Equalizers, to compel the performance by them, respectively, of the duties enjoined by statute in respect to the assessment of the distributable property of railroads. (*Post,* p. 505.)

   Case cited and approved: 37 N. Y., 344.

2. **Assessment of Railroads for Taxation.** *Powers of Board of Examiners.*

   The State Board of Examiners of the distributable property of railroads has authority to demand from the State Board of Assessors and Equalizers a record meeting the statutory requirements that the Board of Assessors shall certify to the Comptroller the amount to be taxed to each railroad company, "with all the facts" that the Assessors are required to gather, to be by him submitted to the Board of Examiners, where the former board has failed to make up and transmit such record as will enable the latter to take intelligent action upon the assessments, and in such case the imperfect records may be remanded to the Board of Assessors for such addition and amendment as will supply the defects. (*Post, pp. 505–512.*)

   Acts construed: Acts 1875, Ch. 78; 1877, Ch. 19; 1881, Ch. 104; 1882, Ch. 16 (2d Ex. Sess.)

   Case cited and approved: Railroad v. Bate, 12 Lea, 574.

3. **Same.** *Mandatory and discretionary duties of boards.*

   The statutory requirements that the Board of Assessors shall certify "all the facts" upon which its assessments are based,

and, for this purpose, shall by some lawful method ascertain the facts, are mandatory. So, likewise, the requirement that the Board of Examiners shall confine themselves to the "record" thus made up, is mandatory. But the Board of Assessors exercises discretionary powers as to the methods to be pursued in ascertaining the facts, and in fixing valuations. (*Post, pp. 506–511.*)

Case cited and approved: 65 Ala., 142.

4. SAME.   *Not complete until Board of Examiners has acted.*

Assessments of distributable property of railroads are not complete until they have been acted upon by the State Board of Examiners. (*Post, p. 506.*)

Acts construed: Acts 1875, Ch. 78; Acts 1877, Ch. 19.

Case cited and approved: 22 Fed. Rep., 481.

5. SAME.   *Construction of statutes relating to.*

The statutes relating to assessment of distributable property of railroads constitute a system, and should be construed so as to make that system consistent in all its parts and uniform in its operation. (*Post, pp. 509, 510.*)

Acts construed: Acts 1875, Ch. 78; Acts 1877, Ch. 19; Acts 1881, Ch. 104; Acts 1882, Ch. 16 (2d Ex. Sess.).

Cases cited and approved: 109 Ind., 466; 133 Ind., 526.

6. MANDAMUS.   *Return.*

Every intendment and presumption will be made against the return to a writ of mandamus which fails to answer the material allegations of the petition. (*Post, p. 513.*)

Code construed: § 4310 *et seq.* (M. & V.); § 3567 *et seq.* (T. & S.).

Case cited and approved: State *v.* Board of Inspectors, 6 Lea, 12.

7. SAME.   *Same.*

Allegations in a petition for mandamus, not denied or confessed and avoided, are taken to be true. (*Post, p. 513.*)

8. SAME.   *Same.*

A motion by a relator for a peremptory writ of mandamus is equivalent to a demurrer to the return for not stating facts sufficient to constitute a defense. (*Post, pp. 513–516.*)

9. SAME.   *Writ refused, when.*

The granting of the writ of mandamus, even when the right

32—12 P

thereto is clear, lies in the sound discretion of the court; and where the court can see, upon a review of the whole case, that public interests and business will be thereby prejudiced and hindered, or the rights of third persons injuriously affected, without reasonable expectation of compensating benefits, the writ will be denied. (*Post, pp. 516–520.*)

FROM DAVIDSON.

Appeal from Circuit Court of Davidson County. CLAUDE WALLER, J.

Attorney-General PICKLE, GRANBERY & MARKS, and CORDELL HULL for Harris.

VERTREES & VERTREES for Relators.

BEARD, J. In this case a petition was filed in the Circuit Court of Davidson County by the State, on the relation of Peter Turney, Governor, E. B. Craig, Treasurer, and W. S. Morgan, Secretary of State, constituting the Board of Examiners of assessments of the distributable property of the various railroads in the State, asking that a writ of mandamus might issue, requiring James A. Harris, Comptroller of the Treasury of the State, to receive from said board all the records of assessment of this property for the year 1895, and to turn over these records to the State Board of Assessors and Equalizers, and that a writ of mandamus also issue to Geo. C. Porter, John C. New, and W. C. Fulcher,

constituting this last named board, requiring them
to receive the records from the Comptroller, and,
having received them, that they take evidence of the
character and value of the railroad property in the
State, and reassess the same.

In accordance with the prayer of this petition,
an alternative writ of mandamus was issued, to
which the defendants filed a demurrer, and, at the
same time, made a return or answer. By agreement,
the demurrer and the answer were heard together
by the Circuit Judge, the result being that
a judgment was given awarding a peremptory writ.
From this judgment the defendants have appealed to
this Court.

In the petition the relators have set out, with
great fullness of detail, the requirements of the
statutes in the assessment of the distributable property
of the railroads, including the methods to be
pursued by the Board of Assessors in arriving at
its character and condition, not only to enable themselves
to arrive at a reasonable conculsion as to its
value, but also to furnish a basis for the work that
the Board of Examiners have to do when the records
of these assessments reach them for examination.
To this end, the relators allege that the Board
of Assessors were required to embrace in this record
all the facts essential, under the statute, in making
these assessments, so that, when it came to the
Board of Examiners, they might find reliable data
therein upon which to discharge the duties imposed

by law upon them. , In failing to ascertain and embody such facts in the record made up and certified to the Board of Examiners, it is averred that the Board of Assessors have been guilty of great official dereliction.

In their answer or return to the writ the defendants deny that they have failed, in any respect, to discharge their statutory duty, and they further deny the right of the examiners to call upon them for additional evidence, and insist that, having closed the record and deposited it with the Comptroller for transmission to the examiners, all control over it, or power with regard to the assessment of taxes for the year 1895, has ended.

To the proper understanding of the issues in this case, and the respective duties and rights of these two boards, as well as the relation of the Comptroller to them, it is necessary to examine the various statutes of this State providing for the assessment and taxation of railroad property.

By Chapter 78 of the Acts of 1875, the Legislature, for the first time, undertook to formulate a system for this purpose. In Section 1 of this Act it was provided "that each railroad company owning and operating a railroad in the State shall, on or before the first day of May of each year, make out and file with the Comptroller of the Treasury, a complete schedule of all its property—real, personal, and mixed—setting forth therein the length of miles, or fraction thereof, of its entire roadbed,

switches, and side tracks; . . . the total amount of capital stock, the number of engines and their respective values, the gross annual receipts," etc., with the value thereof. Section 2 provided that "when any company has filed the same" (the schedule), or neglected and refused so to do, the Comptroller shall notify the Governor of the fact, and thereupon "he shall appoint three citizens to act as railroad tax assessors." By the terms of Section 3, these Assessors are required, on the first Monday of June after their appointment, having first received the schedule from the Comptroller, to proceed at once to ascertain, test, and value the property belonging to said railroad company. In making such valuation, they shall have in view and look to the capital stock, the corporate property, the franchises of each company, as well as the gross receipts and the individual stock of each shareholder; and, to ascertain these facts, they shall have power to summon before them any person, and to call for the books of the company, and administer oaths, etc. Section 4 provides "that if any railroad company fail or refuse to file the schedule" required, or having filed the same, the Assessors regard the same as not fair and just, said Assessors are hereby empowered" to ascertain "the items and value of any property in such manner as they may deem best," etc., while Section 5 authorizes a personal inspection of the railroads by the Assessors at the expense of the State. When the Assessors have

discharged the duties imposed by the foregoing sections, then they are required by Section 6 to certify to the Comptroller the amount to be taxed to each railroad company, "together with all the facts;" and he is then to submit the same forthwith to the Governor, Secretary of State, and Treasurer, constituted a Board of Examiners, and if they, or any two of them, find that the valuation, so reported, of any railroad company is too low, or is not just and fair, it shall be the duty of the Governor to appoint another Board of Assessors, whose duty it becomes to proceed at once to value the property, and their valuation is made final.

Litigation resulted from this act, and this, added to the discovery of real or apparent defects in it, led to the passage of the amendatory Act, found in Chapter 19 of the Acts of 1877. By this the term of office of the Assessors was made two years, and they were required to elect a president and secretary, the duty of this latter officer being to "carefully preserve and file away all reports, documents, and proof taken or used by said Assessors." It was also provided that all proof taken by the Assessors should be reduced to writing, and sworn to and signed by the parties giving it. But the most important amendment of the original Act is found in Section 13, which provides that the action "of the Board of Examiners constituted by the sixth section of the Act of 1875, shall be final and conclusive; and that this board shall examine the questions of

assessment and valuation as upon an appeal upon the record made up by the railroad tax assessors; and said Board of Examiners may, if they think the assessment made by the railroad tax assessors is too high or too low, change the same so as to fix the real value of said railroad, which valuation shall be assessed against them, and the taxes due thereunder be paid.''

The Legislature, by Chapter 104 of the Acts of 1881, again amended the Act of 1875, and provided that, in addition to the requirements of Section 1 of that Act, each railroad company should include in its schedule the cost of construction and equipments, as near as possible; the amount of dividends declared; the amount and value of its stock in the market for the year preceding; a full report of its outstanding indebtedness, together with a statement of the property mortgaged to secure its bonds, and, lastly, the market value of its bonds for the preceding year. The only other amendatory statute bearing on this investigation is found in Chapter 16 of the Acts of the second extra session of 1882, when, for the first time in this State, railroad property is divided into two classes—to wit, distributable and localized—the first of which is to be assessed and valued under the provisions of the Act of 1875, and the various amendments thereto, set out above.

Rejecting all the repugnant sections of the original and amendatory Acts, and taking this legislation as a consistent whole (Sedgwick on Stat. Con., p. 68;

*Reg.* v. *Overseen,* 107 E. C. L., 224), this general summary, sufficient for our immediate purpose, may be made:

1. The duty of each of the railroads is, by the first of May of each year, to file with the Comptroller schedules containing certain distinct statements, in conformity to the directions of these statutes.

2. These schedules are to be turned over by the Comptroller to the Assessors for their use. If none are furnished, or, if furnished, they are unsatisfactory, the Assessors may ascertain the facts which the schedules should contain in such manner as they may deem best. If they see proper to resort to proof, it must be on notice, and the proof must be reduced to writing, signed, and sworn to by the parties giving it.

3. They may jointly or singly inspect the property of any or all railroads in the State for the purpose of gathering facts to aid them in their valuations, but these facts, if used by them, must be preserved in record form.

4. When they have acquired the essential knowledge and made their valuations, they must certify the amount to be taxed to each company, "with all the facts," to the Comptroller, who is then to turn over the "record" so made up to the examiners.

5. The Board of Examiners, upon receiving it, are to make their examination on this record, and if they find that the assessments of the Assessors are too high or too low, they may change the same

so as to fix the real value. Their determination of this question is made final and conclusive.

With these preliminary statements, we come to examine the questions of controversy in this cause. The objection is rather suggested than urged, that this proceeding ought not to be maintained, because the relators are three citizens, not even alleging that they are taxpayers, or that they have any special interest in it. To this suggestion it may be replied, that, while the relators institute this action as citizens, they also do it as officers of the State, who aver that certain duties, which the law requires them to perform, depend for their performance upon the prior discharge of official obligations, which, it is insisted, defendants persistently refuse to recognize. In addition, however, as was said by Judge Fullerton, in *People* v. *Halsey*, 37 N. Y., 344: "Inasmuch as the people themselves are the plaintiffs in a proceeding by mandamus, it is not of vital importance who the relator should be, so long as he does not officiously intermeddle in a matter with which he has no concern. The office which a relator performs is merely the instituting a proceeding in the name of the people and for the general benefit." Certainly, it cannot be affirmed that these relators are "officious intermeddlers," or have in view any other than the public good.

But the most earnest resistance is made by the defendants to the claim of the Board of Examiners of the power to remand the assessments in question

to the Board of Assessors for amendment or correction, including the claim of power to set aside assessments already made by this board, and require additional proof to be taken and reassessments to be made.

We have already set out the salient provisions of the various Acts of the Legislature (save that of 1895, which, it is agreed, does not apply here) with regard to the assessment of railroad property. We think a careful reading of these Acts will satisfy anyone that these two boards occupy important, if not vital, positions in this peculiar system, and that the work of each is essential to its successful operation. It was properly said, in argument, that the Board of Assessors in this scheme are the "record makers," while the action of the Board of Examiners determines that which was before indeterminate, and makes final and conclusive the work of assessment. For it may as well be said here as elsewhere that the assessment is not complete, so that the tax levied by the State can be applied to the railroad properties until the work of the Assessors had been passed on by the examiners. *Louisville & Nashville Railroad* v. *Bate*, 22 Fed. Rep., 481.

But not less explicit are these statutes as to the duties of the Assessors. As before stated, they are the "record makers." This legislation assumes that the railroads of the State will file with the Comptroller, for the use of the Assessors, full and complete schedules of their property, with all necessary

details.     But it also assumes that the railroads may omit to submit schedules, or, even if submitted, that they may fall short of statutory requirements.     If filed, and found to be full, fair, and just, the Assessors would have the power to confine themselves · to the schedules.     Even if deemed full and fair, yet the Assessors may, if they deem it wise, verify them by an examination of the books of the railroad company, or by summoning before them parties familiar with the facts, or · by personal inspection of the properties.     But if the schedule of any company is not forthcoming, or if, when filed, it is found unsatisfactory, then the Assessors are authorized to ascertain the items and value of the property of the railroad in any manner they "shall deem best."     Whatever the mode, however, they adopt to obtain a knowledge of the facts essential to a proper assessment, these facts, when secured, must be embodied in record form, and certified, through the Comptroller, to the Board of Examiners, for it is on these recorded facts alone that these latter officials are to exercise their judgment as to the amount to be taxed to each railroad company.     And the provisions of the statute requiring the Assessors to certify "all the facts," and the examiners to confine themselves to the "record" so made up, are mandatory.     *State Auditor* v. *Jackson*, 65 Ala., 142.

The same statute which requires the Assessors to gather facts for a record also provides that the examiners shall make their examination on this

record alone. The Legislature, so complex and unique is railroad property, deemed it wise to intrust its assessment to two boards, and made the action of the two essential to completeness of the work. · *Lovisville & Nashville, Railroad* v. *Bate,* *supra.* With records made up of facts such as the law requires, certified and transmitted to the examiners, should the latter fail or refuse to perform their duty, mandamus would lie. Merrill on Mandamus, Sec. 32. But, concede that an imperfect record reaches them—imperfect in the lack of facts to enable them to exercise their judgment as to values—could they be reached by compulsory process? We think not. As to this, however, the defendants say: "If the record is such as not to enable them (to make the required examination), or if from the record they cannot think any particular assessment too high or too low, they have no duty to perform, and the assessments remain as made by the Assessors." This suggestion is in the face of the statute. As already said, it is mandatory in its terms. The use of the auxiliary verb "shall"— "shall examine"—emphasizes the meaning, and indicates · a duty or necessity on their part, the obligation of which is derived from legislative sanction. The imposition of this work on them assumes that the Assessors have already completed theirs as "record makers," but it equally assumes that they may make mistakes in their valuation. It is true, if any are found, that the Board of Examiners are

to correct, and then give final sanction to the whole. Lacking the facts essential for an intelligent examination on their part, we think it clear that they could not be reached by mandamus. In such a case, then, are the examiners paralyzed in the discharge of their duties? If so, they can neither act nor be compelled to act; then the system so carefully devised is a snare and a delusion. But it is insisted that, in the failure of the Assessors to send up a statutory record, the examiners are powerless, because the statutes have not expressly provided a remedy for this contingency. But we have already seen that since 1875 the Legislature has been diligently engaged in passing laws to meet the peculiarities of railroad property for purposes of taxation, and, finally, to this end, adopted what may well be called a system. As has been before said, this system is composed of two parts, each of which is necessary to the completness of the whole, and to its successful operation. In it the work of the Assessors is the most laborious, if not the most important; but that of the examiners is neither trifling nor insignificant. That both have serious responsibilities imposed upon them is apparent. This being so, we think it "the duty of the Court to effectuate that intention by such a construction as will make that system consistent in all of its parts, and uniform in its operation." *Lutz* v. *Crawfordsville*, 109 Ind., 466; *C. C. C. & St. L. Ry. Co.* v. *Backer, Tr.*, 133 Ind.,

526. And we have no doubt of the right, but also of the duty, of the Board of Examiners, when they find themselves confronted with a record falling so short of statutory requirements as to render it impossible for them to apply an intelligent judgment to it, to suspend action, and demand from the Assessors one meeting those requirements. But it is said in argument that the statutes do not expressly give the examiners the power to remand, and that to impute such power to them will violate settled rules of construction in such cases; and to the proposition that boards of review can exercise only statute-conferred powers, many authorities are cited by counsel for defendants. Conceding that these authorities announce a sound rule, they are not in point in this case. Here the real question is not as to the power to remand, but it is rather as to the right of the examiners to demand a record of facts, such as the Legislature made it the duty of the Assessors to prepare and transmit. It is true that the examiners cannot require, nor could the Courts compel, the Assessors to adopt any particular mode to ascertain these facts for this record, because the statute authorizes them, in collecting these facts, to pursue any method they deem best, outside of specified directions. Nor can the examiners insist that they should change any valuation the Assessors may see proper to fix on these properties, and no more can the Courts, by any process, compel them to make such a change, for in this they

exercise discretionary power. The Assessors are *quasi* judicial officers, and as to these matters of discretion, they cannot be controlled. But, while the Board of Examiners cannot direct the Board of Assessors in their lines of investigation, they can insist upon their adopting some one or more of the methods open to them to obtain the facts made material by the statute. They can say, if it be true, you have failed to certify to us the facts which the law required you to gather for your and our guidance, and in the absence of which we are unable to render to the State that service required of us. We will therefore suspend all action until, pursuing your own mode of collecting these facts, you have transmitted them to us in proper form. And in such a case we think it not improper that the records already made up by the Assessors, should be returned to them by the examiners for their use, containing, as they likely would, much of value in enabling them to complete their unfinished work. But it is insisted that the power of the Assessors ended with the deposit of their records with the Comptroller. We think not. The statute does not so provide. If they have turned over unfinished records, their duty is to finish them, and their power must be coextensive with their duty. This is the effect of *Railroad* v. *Bate*, 12 Lea, 574.

Again, it is insisted that, to give by construction to the Board of Examiners the right to call upon

the Assessors to make up a more perfect record, clothes them with a power superior to a Court of last resort, when it comes to try a cause on a defective transcript; that, in such a case, it is the duty of the Court to pass on the record as it is, leaving the responsibility of any failure of justice upon the party litigant who has failed to put into it any facts necessary for his protection. We do not think this illustration put is apposite. There is no duty imposed by statute or by common law upon a litigant, when preparing to take his case from an inferior to a superior Court for review, to embrace any part of the evidentiary facts upon which he relies in his bill of exceptions. He can put into it much or little, or none at all, of these facts at his pleasure. If it turns out, either through design or neglect, that he has failed to embody facts essential to his relief, then the loss will fall where the responsibility for making up the transcript lay. Not so, however, as to the Board of Assessors. They do not occupy the position of private litigants, but of public servants, upon whom the law has imposed, in definite terms, the duty of gathering facts which the Legislature regarded as necessary to a full and fair assessment of railroad property for taxation, and then of certifying, in record form, both facts and their conclusions, as to values, for the use of the examiners. Such being their statutory duty, then it is clear, upon authority, that, in a case which will make it proper, a Court will constrain them to its

performance by its writ of mandamus. So far, we have been dealing with the general system—with the statutory rights and duties of the two boards, and with the supervisory power of the Courts over both by mandamus proceedings. The question remains whether, upon this record, the present action is maintainable. "The power to issue mandamus, and the practice under it, is, to some extent, regulated. in this State by statute. Code, § 3567, *et seq ;*" *The State* v. *Board of Inspectors*, 6 Lea, 12. By these provisions the return to the writ is made traversable, and the averments of the · petition may be put in issue by a denial in the return or answer, in which event the case will be determined by the Court, or tried by the jury on evidence. With these exceptions, the proceeding is one largely controlled by the rules of pleading established by the common law. Spelling, *ex rel.*, Sec. 1366.

Among these rules, we think the following are well established:

1. Whenever it appears that "the return fails to answer the important facts alleged ˙in the petition, every intendment and presumption will be made against it." High on Ex. Leg. Rem., Sec. 461.

2. That allegations not denied, nor confessed and avoided, are taken to be true. Merrill on Mandamus, Sec. 274.

3. That "if the relator moves for a peremptory writ upon the pleadings, this motion is equivalent to a demurrer to the return for not stating facts

33—12 P

sufficient to constitute a defense.'' High on Ex.
Leg. Rem., Secs. 521, 523 ; *The State* v. *Board,*
*supra.*

Practically, this case has been submitted to us
on the pleadings. In view of the disposition we
propose to make of the controversy, it is unneces-
sary to state them with great detail. It is suffi-
cient to say that relators charge the defendants
with serious official neglect. They allege that their
record is made up exclusively of imperfect schedules
filed by the railroads, lacking largely in essential
matter, and minutes of the inspecting tours of the
Assessors, no one of which contains a statement of
a single fact of worth to the examiners in the
work they have to do; and that, as to six railroads,
there is neither schedule nor minutes, and that the
valuation of the Assessors as to these is altogether
arbitrary. After stating omissions to be found in
all the schedules, the relators indicate particular
roads with specific defects in their schedules. Among
the omissions specially complained of is the failure
to state the amount of capital stock, the value of
this stock, the amount of outstanding bonds, the
value of these bonds, the gross receipts, and the
dividends paid. The petition avers that, by reason
of these defects and omissions, it was impossible
for relators to ascertain and determine the value of
the railroads to be assessed.

Replying to these averments, the Assessors do not
deny that the record sent to the examiners consisted

alone of the railroad schedules and the minutes of their tours of observation; nor do they deny that these schedules failed in many statutory details, and that these minutes were barren in all matters of value; nor do they deny that among the omissions specially complained of by relators, was the failure to state the capital stock, the value of this stock, the amount of outstanding bonds, the value of these bonds, etc. They aver, however, that they acted diligently and conscienciously in gathering information for the work they had to do within the limited time allowed for its performance, but, at the same time, state that much that the statute requires "to be known of the railroads," with a view to a fair assessment of their property, it is impossible to ascertain, and, such being the fact," in the exercise of their discretion, they made no effort in that direction, as they were advised that they were "not required to ascertain impossibilities." At the same time they allege they informed the Board of Examiners that, in arriving at the valuation of property to be assessed, they consulted a work known as "Poor's Manual," which gives all the information contained, or which should be contained, in the schedules required from railroads, and that they offered to turn this book over to the examiners as a part of the record for their reading, but they neither explain what this "Manual" is, nor what authority on railroad properties it possesses, nor why it contains information which they have already said it

was impossible to obtain, nor do they aver that it was made a part of the record to which the examiners could alone look. They admit that the market value of the stocks and bonds of many of the roads is not given, but they say that this omission is of no importance, because this value, as they insist, has little bearing in fixing the value of railroad property for taxation. As to this, however, the Board of Assessors differ from the Legislature, which, thinking otherwise, made it their duty to ascertain this fact; but also from the Supreme Court of the United States, which, in the State Railroad Cases, 92 U. S.; 575, speaking through Justice Miller, said: "When you have ascertained the actual cash value of the whole funded debt, and the current cash value of the entire number of bonds, you have, by the action of those who, above all others, can best estimate it, ascertained the true value of the road, all its property, its capital stock, and its franchises."

Without further analysis of the pleadings, we have, then, a record before us in which the Assessors admit, either in express terms or by necessary implication, serious official delinquency—a negligence and indifference in the discharge of statutory duties which is inexcusable, and threatens to render abortive a system of assessment the work of years of legislative experiment. But the question still remains, even in view of this, will the Court, while it has the power, interfere by the writ of mandamus ? It

is well settled that "the Courts have. a discretion whether they will issue or refuse the writ, even where a *prima facie* right thereto is shown." Merrill on Mandamus, Sec. 62.

"In exercising such discretion, the Courts will consider all the circumstances, reviewing the whole case, with due regard to the consequence of its action." Merrill on Mandamus, Sec. 63; *Alyn* v. *Seaver*, 138 Mass., 331; *People* 'v. *Ketchum*, 79 Ill., 212; *People* v. *Genesee, Circuit Judge*, 37 Mich., 281.

As was said by the Supreme Court of Mississippi, in *Effingham* v. *Hamilton*, 68 Miss., 523: "It is not in every case of clear legal right, and the absence of sufficient legal remedy, and where, therefore, mandamus is an appropriate remedy, that it will be issued. It is well settled by numerous decisions, that a sound judicial discretion is to be used, and where the circumstances make it unwise and inexpedient to allow this writ, to refuse it when sought to enforce merely private right." The Court then stated the embarrassing condition of that case, and added: "In view of these complications, and the evil consequences likely to arise affecting public interests, we deem it proper to deny the remedy. sought."

To the same effect is the text of Spelling on Extra Relief, Vol. 2, Sec. 1372: "The writ will usually be refused, notwithstanding a clear right is shown, if, by granting it, public interests would

be seriously prejudiced, or public transactions hindered, or the rights of third parties interfered with injuriously."

In the light of these principles, we will examine this cause. It is shown that on the sixteenth day of October, 1895, the Comptroller, having already received the records in question from the Board of Assessors, as was his duty, turned them over to the Board of Examiners. On the twenty-ninth of October the latter board addressed their first communication to the Assessors, indicating dissatisfaction with their work, and asking for the proof upon and the rule by which they had made their assessment of the railroad properties. On the same day the Assessors replied to this communication. On the sixth of November these records were delivered by the examiners to the Comptroller, James A. Harris, with a communication instructing him to turn them over to the Board of Assessors, to whom they were to be recommitted for such supplementary work as, it was insisted, would make them conform to statutory requirements. On the same day the Comptroller, declining to receive or deliver them to the Assessors, returned them to the office of the Secretary of State. The efforts of the examiners to induce the Assessors to receive these records, or file supplementary ones, having proved ineffectual, on the fourteenth of December the petition for alternative mandamus in this case was filed and granted. In the return to this petition and writ, the respond-

ents, among other things, say: "The Comptroller has certified the assessment as made by the Board of Assessors to the various counties, municipalities, and railroads, and the railroad companies have signified their willingness to accept said assessments and pay the taxes due thereunder, and are now doing so, as they have heretofore."

In view of this averment, admitted to be true, on this motion for a peremptory writ, should a writ of mandamus be issued? Three months of the year 1896 have nearly expired, and it is probably true that, as the railroads were engaged in paying their taxes at the time these proceedings were instituted, the greater part, if not all, of these taxes for the year 1895, have been paid not only to the State, but also to the various counties and municipalities upon the assessments incomplete, as we have seen, under the law, yet accepted by the roads as complete. It is impossible for us to know what would be the result of the action of the Assessors and examiners upon new evidence of values gathered and acted upon as contemplated by the statute. Whether the result should be to raise or lower the basis of valuation already certified by the Comptroller, and accepted and acted upon by the railroads, it seems to us that it would produce much of difficulty and confusion. And we do not think, from what we see in this record, that there will be compensating advantages to the public for the complications and difficulties that might arise from these

possible changes. In addition to this, under Chapter 120 of the Acts of 1895, new and important duties were imposed upon the Board of Assessors and Equalizers, to the proper performance of which time, labor, and painstaking examination are essential. To such an extent were these duties magnified by this Act, that it requires them to meet on the second Monday in January, and "at once begin" their work. If their service is to be anything but formal, and prove of any value to the State, their time should be largely occupied with the assessments of 1896, leaving them little opportunity to make up a new record for 1895.

Believing, therefore, that public interests will not be subserved by granting a writ of mandamus at this late day, the judgment of the Circuit Court awarding it is reversed, and the petition is dismissed.