STATE of Tennessee, on Relation of Roger WEAVER, and the Wynn Community, Plaintiffs–Appellees,

v.

Tony AYERS, Melvin Boshears, Roger Byrge, Mack Dilbeck, Johnny Joe Dower, Whit Goins, Herbert Hackler, Kenneth Johnson, Lucy Lobertini, Calvin Morton, Paul Muse, Carl Teague, Jerry Wells, and Ray Wilson, constituting the Board of Commissioners of Campbell County, Tennessee, Defendants–Appellants.

Supreme Court of Tennessee, at Knoxville.

July 18, 1988.

William S. Cooper, III, Thomas W. Phillips, Phillips & Williams, P.C., Oneida, for defendants-appellants.

Philip P. Durand, Stephen W. Gibson, Ambrose, Wilson, Grimm & Durand, Knoxville, for plaintiffs-appellees.

OPINION

DROWOTA, Justice.

This direct appeal involves the issue of whether a Writ of Mandamus should have been issued by the Chancery Court for Campbell County to compel the Campbell County Board of Commissioners (the Board of Commissioners or Defendants) to appropriate funds to construct a new school at a site selected by the Campbell County Board of Education (the Board) to replace the school in the Relators' community (the Wynn Community; hereinafter, the Relators). At some point prior to August, 1985, the State Fire Marshall's Office issued a cease and desist order regarding the use of this school (the Wynn School) due to fire code violations in the structure, which was

originally built in 1930 and to which several subsequent additions had been made. At the time of its condemnation, the Wynn School housed kindergarten through twelfth grades (K–12) and had a total attendance of approximately 379 students.

## I.

Following the Fire Marshall's cease and desist order, the Board held meetings in August, 1985, at which residents of the Wynn community requested the Board seek funding for a new school. The Board discussed the site proposals and continued to obtain site evaluations during the subsequent months.[1] The best proposed site that could be found, which did not comply with State regulations for school sites, presented some construction obstacles. Nevertheless, the Board adopted a resolution on December 12, 1985, requesting the Defendants to fund a new Wynn School at this proposed site; this resolution was transmitted to Defendants for action at the December 16, 1985, meeting of the Board of Commissioners. The Defendants did not, however, take any action on the Board's request at this meeting. During the following months, the office of the State Commissioner of Education (the Commissioner), who was monitoring the predicament with the Wynn School, evaluated the problems of relocating the Wynn School at the proposed site. On March 14, 1986, the Superintendent of Campbell County Schools (the Superintendent) wrote a letter to the Commissioner to inform him that Defendants had refused to fund a new Wynn School until the proposed school had the State's approval. The Commissioner replied on March 21, 1986, and extended the deadline for the Board's submission of a school plan to deal with the Wynn problem until May 15, 1986.[2] On April 10, 1986, the Board met to consider a comprehensive plan for the Wynn School.

On May 5, 1986, the Commissioner wrote to the Superintendent concerning the situation with the Wynn School. He specifically observed that the proposed site for the new school was inadequate and that the Wynn high school program did not sufficiently prepare students for college or entry into the labor force. A larger school was required to expand the curriculum offerings and the elementary and middle schools needed to be separated from the high school for consolidation with other schools of the same types. He suggested that the Wynn situation should not be considered in isolation to the requirements of the county-wide education program, noting that

"[t]he inadequate curriculum, and the financial circumstances in Campbell County make it imperative that you, the school board and county commission carefully review the options ..., consider the observations in this letter and take the action necessary to insure the best possible program for the children in a cost effective manner for the taxpaying citizens of Campbell County."

The Commissioner then outlined the steps necessary to obtain State approval for a proposed plan, which was due by May 15, 1986. On May 22, 1986, a special meeting of the Board was called after the Board of Commissioners again refused to fund a new school for the Wynn community. Shortly thereafter, the Commissioner wrote to the Superintendent on June 3, 1986; the Commissioner first commented that

"[w]e understand that, on at least two occasions, the County Commission has been asked to provide the funds necessary to construct a new facility for grades K–12. We further understand that in each instance the Commission rejected the board's request. I share the Commission's concern about an expenditure of that magnitude and in my opinion the Commission acted in a wise manner."[3]

1. At least one site evaluation had been done in June, 1985. The date of the Fire Marshall's cease and desist order is not apparent in the record.

2. The Board was also working under an independent deadline imposed by the State Fire Marshall's Office.

3. Cost estimates for the new Wynn School were about 1.7 million dollars.

Then in unequivocal language, the Commissioner stated that "[i]n view of the number of children at [Wynn], the limited course offerings and the importance of considering the educational needs and the funds necessary to implement a county-wide program, I am advising you that *the board's plan for a new K–12 grade school is unacceptable.*" (Emphasis added.)

In August, 1986, the Board held two meetings regarding the Wynn School proposal but decided to defer any action until after the next county commission meeting, despite the fact that submission of a plan to the State was overdue. On August 18, 1986, the Board of Commissioners adopted a resolution approving the funding of the new Wynn School at the proposed site. The Superintendent received a letter from the Commissioner, dated August 22, 1986, in which the Commissioner noted that the plan submission was overdue and reiterated that the proposed Wynn School plan had previously been rejected by the State. The Commissioner also stated his opinion that the August 18, 1986, resolution of the county commissioners did not constitute an approved bond resolution and could not be considered funding of the plan. He suggested that the Board formally request the State to conduct a comprehensive survey of the Campbell County Public Schools to obtain the State's recommendations for "a comprehensive, cost-effective, educational improvement program." At a special meeting the following month, the Board adopted a resolution, dated September 4, 1986, in which it formally requested the State to conduct a comprehensive survey of county schools.

During the months of September and October, 1986, the Commissioner's office conducted an expedited survey. In the report of the survey results, the survey team noted that "[t]he board is fiscally dependent upon the 14–member county commission which must approve the operating budget of the school system." In its general observations regarding the operation of the Board, the team commented that the Board tended to function more as a representative body than as an administrative board serving the best interests of the county school system as a whole. The special problems presented by Campbell County's mountainous terrain were clearly recognized by the survey team; nevertheless, the report observed that many Campbell County students were transported to schools outside their attendance areas, passing schools closer to their residences to reach the schools they attended. In addition, secondary school services were not being equitably provided to all students, particularly referring to the Wynn and Jellico high school situations.[4] The survey team made a number of recommendations for the reorganization of the county schools. To make better utilization of available funds, the survey recommended that the Wynn high school students be consolidated with the Jellico high school students to form a new high school to be located and built in the northern section of the county. This solution to the problems with both schools would create a conveniently located high school with about 500 students, approximately enough to provide a comprehensive high school curriculum.

Following the August 18, 1986, meeting of the county commission, at which the resolution approving the funding proposal for the new Wynn School was adopted, a county commission election was held. A majority of the county commissioners were replaced and no appropriation was subsequently made by the newly elected Board of Commissioners to fund the proposed school project. Consequently, on January 7, 1987, the Petition for Writ of Mandamus was filed by the Relators in this case to compel the Defendants to fund the new Wynn School at the proposed site. The following month, on February 16, 1987, a bond resolution to fund the new Wynn School failed in the county commission. On April 3, 1987, Defendants filed their first Motion to Dismiss or for Summary Judgment; the Relators filed their Re-

---

**4.** The Jellico facility is apparently in need of fairly extensive renovation as well. The Wynn community is about 10 to 12 miles from Jellico.

sponse on May 14, 1987, opposing the Defendants' Motion. On May 18, 1987, the Chancellor filed a Memorandum Opinion that found that the August 18, 1986, resolution of the Board of Commissioners was invalid for a number of reasons. Regardless, the trial court did not dismiss the Petition because it found that an enforceable legal duty existed on the part of Defendants to fund the proposed project once the Board had made the determination that the new school project was needed. The Petition for a Writ of Mandamus was amended on June 22, 1987, after the county commission again refused to approve a bond resolution for the new Wynn School on June 15, 1987. Following the filing of the Amended Petition, the trial court reopened the proceedings by an order of June 24, 1987. On July 23, 1987, Defendants filed a second Motion to Dismiss or for Summary Judgment.

During the pendency of the Petition, the Superintendent continued to receive letters from the State concerning the unresolved situation with the Wynn School. On July 30, 1987, the State Fire Marshall required the Board to refrain from further use of the old Wynn School facilities. Prior to the hearing in this case, the Commissioner sent a letter to the Superintendent on August 14, 1987, urging the Board to make progress in dealing with the Wynn School situation and ordering the Board to cease using the present Wynn facility. The Board redistributed the Wynn School faculty and students for the 1987–1988 school year.

On September 4, 1987, a hearing was held. The Relators declined to present any evidence and chose to rely upon their legal position that the prior ruling of the trial court, finding that the Defendants were under a legal duty to fund the proposed school project, entitled them to a Writ of Mandamus. Defendants called two witnesses. The first was the Superintendent, Kenneth S. Miller. He testified that the Board was deferring action on the new school pending the outcome of this case. He stated that the State had never approved the proposed site for the new Wynn School. The proposed site did not conform to State rules and regulations governing sites and the Board had not obtained a waiver from the Commissioner to permit the school to be located on this site. Superintendent Miller explained some of the problems, especially those involving transportation, associated with the State's recommended consolidated high school for the northern portion of Campbell County. The only other witness to testify was Mr. Thomas S. Keith, an employee of the Soil Conservation Service of the United States Department of Agriculture. He manages the Service's field office in Jacksboro and one of his duties is the performance of soil surveys as requested. In June, 1985, the Board requested that he conduct a soil survey for the proposed site. Mr. Keith testified regarding his findings that the site was prone to some flooding and presented drainage problems as well as moderate to severe construction difficulties due to the types of soil and the slopes of the terrain. Defendants also placed the deposition of Dr. Nile O. McCrary, a facilities specialist for the Tennessee Department of Education, into evidence. He participated in the comprehensive survey of Campbell County Public Schools. Dr. McCrary reiterated the position of the Commissioner regarding the proposal for a new Wynn School in view of the need for county-wide reorganization and the limited availability of funds.

At the close of the evidence, the trial court adhered to its finding that the Defendants had a nondiscretionary duty to fund the new school at the site proposed by the Board. A Judgment and Order for Peremptory Writ of Mandamus was entered on September 21, 1987, leaving to the county commission's discretion whether funding would be by tax levy or a bond issue. A Stay was granted on September 24, 1987, and the next day Defendants filed their Notice of Appeal. We now reverse the judgment of the trial court.

## II.

The law controlling the availability of the extraordinary remedy of the Writ of Mandamus is well-settled in Tennessee.

"It is the universally recognized rule that mandamus will only lie to enforce a ministerial act or duty and will not lie to control a legislative or discretionary duty." *Lamb v. State ex rel. Kisabeth,* 207 Tenn. 159, 162, 338 S.W.2d 584, 586 (1960) (citation omitted). The distinction between ministerial duties and discretionary acts is generally

" 'that, where the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment, the act is ministerial, but where the act to be done involves the exercise of discretion and judgment it is not deemed merely ministerial.' "

*State ex rel. Millers National Ins. Co. v. Fumbanks,* 177 Tenn. 455, 462, 151 S.W.2d 148, 150–151 (1941) (citation omitted). Furthermore, " '[t]he office of mandamus is to execute, not adjudicate. It does not ascertain or adjust mutual claims or rights between the parties. If the right be doubtful, it must be first established in some other form of action: mandamus will not lie to establish as well as enforce a claim of uncertain merit. It follows therefore that mandamus will not be granted where the right is doubtful.' " *Peerless Construction Co. v. Bass,* 158 Tenn. 518, 520, 14 S.W.2d 732, 732 (1929) (citation omitted). Nevertheless, even in those cases in which a ministerial duty may clearly be found, enforcing that duty by mandamus may not always be automatic when the consequences of enforcement would manifestly prejudice the public interest, *Harris v. State ex rel. Turney,* 96 Tenn. 496, 517–518, 34 S.W. 1017, 1022 (1896), and the court may decline to exercise its discretion upon considering all the facts and circumstances of the case. *State v. Wilbur,* 101 Tenn. 211, 220, 47 S.W. 411, 413 (1898). *See also State ex rel. Branch & Co. v. Sinking Fund Commissioners,* 1 Shannon's Tenn.Cases 490, 504 (1875). In short, "[t]he writ of mandamus will not lie to control official judgment or discretion, but it is the proper remedy where the proven facts show a clear and specific legal right to be enforced, or a duty which ought to be and can be performed, and relator has no

other specific or adequate remedy." *State ex rel. Ragsdale v. Sandefur,* 215 Tenn. 690, 696, 389 S.W.2d 266, 269 (1965) (citations omitted). *See generally State ex rel. Ledbetter v. Duncan,* 702 S.W.2d 163 (Tenn.1985); *State ex rel. Matthews v. Metropolitan Government,* 679 S.W.2d 946 (Tenn.1984); *Waters v. State ex rel. Schmutzer,* 583 S.W.2d 756 (Tenn.1979); *Davis v. Fentress County Board of Education,* 218 Tenn. 280, 402 S.W.2d 873 (1966); *State ex rel. Sims v. Reagan,* 175 Tenn. 607, 136 S.W.2d 521 (1940); *State ex rel. Motlow v. Clark,* 173 Tenn. 81, 114 S.W.2d 800 (1938); *State ex rel. Groce v. Martin,* 155 Tenn. 322, 292 S.W. 451 (1927).

To resolve the issue of whether mandamus is proper in this case, the determinative question is essentially whether Defendants are clothed with any discretion concerning the funding of the proposed Wynn School. The answer to this question is found in the statutes defining the relationship among the State Department of Education, the local boards of education, and local legislative bodies. No doubt exists that providing education is a State function. Not only does Article XI, § 12, of the Tennessee Constitution expressly require the General Assembly to "provide for the maintenance, support and eligibility standards of a system of free public schools," but this Court has recognized for many years that education is a State function. *E.g., State ex rel. Harned v. Meador,* 153 Tenn. 634, 637, 284 S.W. 890, 891 (1925). The General Assembly has enacted a comprehensive and detailed statutory scheme concerning education in this State, compiled in Title 49 of the Tennessee Code and comprising an entire volume of that code. An examination of this statutory scheme clearly reveals that a partnership has been established between the State and its political subdivisions to provide adequate educational opportunities in Tennessee. At the county level, the State has divided the responsibilities allocated to the counties between the county board of education and the county legislative body. While the local board of education has exclusive control over many operational aspects of education

policy, subject to the rules and regulations of the State Department of Education, the county legislative body has the authority to appropriate the funds necessary to carry out the county education program.

Under Article VII, § 1, of the Tennessee Constitution, the county legislative body is elected to represent the people of the county and to act as the deliberative body for county governmental purposes. The Legislature has duly delegated to these bodies the authority to raise revenue and appropriate funds for local governmental purposes, of which education is one, pursuant to Article II, § 29, of the State Constitution.[5] These constitutional provisions are executed through T.C.A. §§ 5–5–101, et seq. T.C.A. § 5–5–101 provides that the county legislative body is the basic legislative entity of the county and is known as the board of county commissioners under T.C.A. § 5–5–102(f) (Supp.1987). Extensive fiscal authority is vested in the board of county commissioners pursuant to numerous statutes. E.g., T.C.A. §§ 5–5–109, 5–5–122, 5–5–123, 5–5–124, 5–7–106, 5–8–101, 5–9–101 (Supp.1987), 5–9–312, and 5–10–408. T.C.A. § 5–9–401 explicitly states that

> "[a]ll funds from whatever source derived, including but not limited to taxes, county aid funds, federal funds, and fines, which are to be used in the operation and respective programs of the various departments, commissions, institutions, boards, offices, and agencies of county governments shall be appropriated to such use by the county legislative bodies."

Each of the referenced agencies of county government, including the board of education, must "file with the county executive for study and submission to the county legislative body ... a budget as to funds estimated to be required by the particular department, commission, institution, board, office, or agency during the ensuing fiscal year." T.C.A. § 5–9–402. The county legislative body is then required "to adopt a budget and appropriate funds for the ensuing fiscal year," T.C.A. § 5–9–404(a), but under T.C.A. § 5–9–404(b), "[t]his section shall not be construed as affecting the laws relative to the budget of the county board of education." Rather, this budgetary process is specifically controlled by other statutory provisions, which must be construed in pari materia, in recognition of the fact that education is fundamentally a State concern. Nevertheless, the County Budgeting Law of 1957, T.C.A. §§ 5–12–101, et seq., requires the county board of education to prepare an annual budget and file it for inclusion in the county operating budget, T.C.A. § 5–12–106(b), so that the county legislative body can appropriate sufficient operating funds with due regard for the fiscal health of the county, T.C.A. § 5–12–106(c) and (d); the County Budgeting Law clearly contemplates a cooperative relationship between the county legislative body and the board of education. T.C.A. § 5–12–106(e). This act also requires the funding of educational programs to "conform in all respects to the classification of accounts as prescribed by the state commissioner of education," T.C.A. § 5–12–107(a)(4), in clear deference to the State's supervisory authority over education. In this regard, T.C.A. § 5–12–113 expressly provides that "this chapter shall not apply to county school funds for any purpose, the county board of education, and the county superintendent unless approved by the state commissioner of education." Thus, an examination of the more explicit provisions of Title 49 of the Tennessee Code controlling the shared authority among the State, the local boards of education, and the local legislative bodies becomes necessary to understand the relationship defined by these statutes and by the in pari materia construction of their provisions.

T.C.A. § 49–2–101 enumerates the duties of the county legislative body regarding education. It considers the board of edu-

---

**5.** This delegation is consistent with the traditional American notion of taxation by representation and with the decentralization of power by the division and distribution of powers, which forms a dominant theme in American government and serves as a system of checks and balances.

cation's recommended budget and provides the "necessary funds to enable said county board to meet all obligations under the adopted budgets." T.C.A. § 49–2–101(2). The county commissioners may submit the question of whether to issue school bonds "for the purpose of purchasing grounds, erecting and furnishing school buildings" to the voters of the county, and if approved by the voters in a referendum, it must issue these bonds. T.C.A. § 49–2–101(5). The board of commissioners has the corresponding power to service the debt created by bond issues under T.C.A. § 49–2–101(6) and the authority to levy such taxes needed "to meet the budgets submitted by the county board of education and adopted by the county legislative body" under T.C.A. § 49–2–101(7). The legislative body may also

> "levy sufficient taxes or provide funds by bond issues by the voters for the purchase of school grounds, the erection and repair of school buildings, and for equipping the same; provided, same shall have been provided for by the county legislative body, or that said county legislative body shall have approved the authorization of same by the county board of education...."

T.C.A. § 49–2–101(8).[6] Finally, the board of commissioners must "provide sufficient funds to erect a suitable building and maintain at least one (1) first-class four-year high school according to the provisions of this title." T.C.A. § 49–2–101(9).

Among the extensive duties of the county board of education and the local superintendent of schools is the duty "to prepare a budget ... and when the budget has been approved by the local board, to submit same to the appropriate local legislative body" pursuant to T.C.A. § 49–2–203(a)(11) (Supp.1987). *See also* T.C.A. § 49–2–301(f)(19) and (23) (Supp.1987). The shared budgetary responsibilities of the local board of education and the board of commissioners are consistently recognized

by the statutes controlling the funding of educational programs. Nowhere in these statutes, however, is the board of education given the direct authority to make appropriations. Moreover, to facilitate State supervision of funding, T.C.A. § 49–2–301(f)(26) (Supp.1987) requires the superintendent "[t]o file with the commissioner of education a copy of the budget adopted by the" local legislative body.

Clearly, the fiscal well-being of the county is entrusted to the board of commissioners, as that body is ultimately responsible for maintaining the necessary revenue to fund the county board of education's programs as well as the other services provided by the county.[7] The county commissioners, who are in the best position to place the board of education's budget requests into the context of available revenue and needs of the county, are expected to consider the fiscal requirements of the entire county and to oversee the process of expenditures as a whole, with due regard for the essential place of education in the governmental services provided by the county. The primary importance of education is emphasized by the extent of authority exclusively vested in the board of education under the statutes, but the responsibility for determining funding of the board of education's programs is not allocated solely to that body. Furthermore, the local board of education is also subject to the controlling statutes, rules and regulations of the State concerning education. Part of the county commissioner's responsibility is to assure the board of education's recommendations are consistent with the State's minimum requirements to prevent loss of State education finance funds to the county, consonant with the county commissioners' responsibility for the fiscal well-being of the county itself.

Among the State's requirements, which are enforced and administered by the Department of Education, are the minimum standards for school sites under T.C.A.

---

6. Other relevant provisions governing the county commissioners' authority to issue bonds are codified at T.C.A. §§ 49–3–1001, *et seq.*

7. All public obligations, including bonds, are ultimately paid through taxation. *See State ex rel. Branch & Co. v. Sinking Fund Commissioners, supra,* at 499–500.

§ 49–3–311(b)(10). The Department of Education has promulgated regulations controlling appropriate school site selection [8] and "[n]o board shall obligate or expend any state or local school funds for any project of a capital outlay nature which does not conform to the standards adopted by the state board as authorized by this subsection (b)(10)." *See also* T.C.A. § 49–3–314(c) (Supp.1987). Moreover, T.C.A. § 49–6–403 requires that each county maintain at least one high school but no additional high schools shall be established with less than 300 students, unless unusual circumstances exist and the Commissioner and State Board of Education have given prior approval to the local board of education to do so. The Commissioner does have the discretionary authority to grant waivers of the State rules and regulations under T.C.A. § 49–1–203, but "only when officially requested by action of the local board of education." State approval is otherwise required by Reg. 0520–1–4–.02(1), Tenn.Admin.Comp., for proposed school sites. *See also* Reg. 0520–1–4–.03(39), Tenn.Admin.Comp.

The case law in Tennessee relevant to the issue presented in the present case recognizes that certain situations do arise under the statutes controlling the funding of education projects in which the county legislative body retains no discretionary authority over funding. Two such situations are the requirements that at least one high school be maintained in each county and that the county legislative body authorize school bonds following the approval of a bond issue by the voters of the county. In *Johnson v. State ex rel. Dulling,* 583 S.W. 2d 754 (Tenn.1979), a county commission refused to issue bonds pursuant to T.C.A. § 49–2–101(5) following a referendum in which the voters approved the bond issue. This Court held that this section of the statute becomes mandatory once the voters, who are ultimately responsible for the taxes needed to service the bond debt, have spoken in an election because the only act left to the commissioners was purely ministerial, that is, merely to authorize the bond

issue. *Id.,* at 755. No discretion was left in the commissioners because they were bound by the vote of the people. *Id.,* at 756. *See also Lamb v. State ex rel. Kisabeth, supra,* 207 Tenn. at 162, 338 S.W.2d at 586. In another case, when a county refused to fund the statutorily mandated county high school, this Court found that the statute plainly and precisely prescribed a legal, nondiscretionary duty and thus that a writ of mandamus was appropriate to compel funding, but the method of funding (by tax levy or bond issue) was discretionary. *State ex rel. Harned v. Meador, supra,* 153 Tenn. at 639–641, 284 S.W. at 891–892. *Cf. State ex rel. Ledbetter v. Duncan, supra* (statutory language required funding but method of funding discretionary). Other situations in which funding would be mandatory can clearly arise under the statutes as well. *See, e.g.,* T.C.A. § 49–3–316(d)(1) and (2).

In construing T.C.A. § 49–2–101(8), which is relied upon by the Relators in this case, this Court has previously found that it involves a purely discretionary act and no positive command of law is created by this provision. *See Miller v. Warren County,* 209 Tenn. 457, 462, 354 S.W.2d 433, 435 (1962). *See also Johnson v. State ex rel. Dulling, supra,* at 755. A careful reading of this statutory provision not only gives the county commissioners discretion to decide whether to issue bonds or levy a tax, but it makes the board of education's proposal subject to the approval of the county legislative body. This approval cannot be compelled under this subsection of the statute as it is presently drafted. While the county legislative body has no authority to select school sites, to erect school buildings, or otherwise manage or control county schools, *e.g., State ex rel. Bobo v. County of Moore,* 207 Tenn. 622, 630, 341 S.W.2d 746, 749 (1960), and *Bandy v. State ex rel. Board of Education of Sullivan County,* 186 Tenn. 11, 15, 207 S.W.2d 1011, 1012 (1948), the legislative body does have the discretion to approve or disapprove an appropriation recommended pursuant to T.C.

---

**8.** See Rules, Regulations, and Minimum Standards for the Governance of Public Schools in the State of Tennessee, Regulations 0520–1–4–.01, –.02, –.03, Tenn.Admin.Comp.

A. § 49-2-101(8). The interaction and co-operation of the board of education and board of commissioners is contemplated by the statutes and, at least under certain provisions, some discretionary authority over funding is retained by the county commissioners. As this Court stated in *State ex rel. Brown v. Polk County*, 165 Tenn. 196, 199, 54 S.W.2d 714, 715 (1932),

> "[w]hile the county superintendent under supervision of the board of education is directed by the Act to make up the budget, the authority to exercise this function does not convey the power to arbitrarily fix the amount that the [county board of commissioners] must raise in revenue to meet the exaction of these officials. The [board of commissioners] is clothed with power to act for the county, and may, within statutory limits, exercise reasonable discretion in fixing the tax for the maintenance of the schools."

(Citation omitted.) Continuing, the Court went on to recognize that the statutes contemplate "reasonable coordination between the revenue spending governmental agencies, of which the county board of education is one, and the revenue raising governmental agencies, of which the [county commission] is another. Without such coordination there would be great confusion in the fiscal affairs of the counties." 165 Tenn. at 200, 54 S.W.2d at 715-716.

■ The statutes, taken together, form a comprehensive statutory scheme allocating responsibility for education among the State Department of Education, the county board of education, and, to some limited extent, the county board of commissioners. Although the board of commissioners has no supervisory authority over the board of education, *State ex rel. Boles v. Groce*, 152 Tenn. 566, 570, 280 S.W. 27, 28 (1925), the Legislature has manifestly vested the authority to appropriate funds for county purposes (including education) in that body alone, as is its prerogative to do, *Crewse v. Beeler*, 186 Tenn. 475, 482-484, 212 S.W.2d 39, 42-43 (1948), and, while the preparation of the budget lies with the board of education, the county commissioners are not wholly stripped of their traditional discretion in making appropriations of county funds. "The county school board and superintendent prepare the budget and it is then submitted to [the county board of commissioners] evidently to determine if the amount of the budget exceeds the total amount of money that has been raised by taxation for general school purposes." *Bandy v. State ex rel. Board of Education of Sullivan County, supra*, 186 Tenn. at 18, 207 S.W.2d at 1014. Some degree of discretion in the county commission is necessary so that a single body may oversee a unified budgetary process to avoid exceeding the available revenue to operate county services efficiently. *See Smith v. Groce*, 158 Tenn. 255, 256, 12 S.W.2d 715, 716 (1929).[9]

### III.

■ In the case *sub judice*, the Relators have not established the existence of a clear and specific legal duty on the part of Defendants to fund the new Wynn School. No referendum to approve a bond issue has been held pursuant to T.C.A. § 49-2-101(5). The county currently maintains its one required high school pursuant to T.C.A. §§ 49-2-101(9) and 49-6-403. No valid and binding funding resolution has been adopted by Defendants. The State has not approved—on the contrary, the Commissioner has expressly disapproved—the proposed Wynn School plan. The site does not conform to State rules and regulations governing site selection, but the Board has not officially sought a waiver of the regulations under T.C.A. § 49-1-203 and no evidence indicates that such a waiver would even be granted. The evidence does show, however, that a new consolidated high school is needed to replace two facilities in need of extensive renovation; other of the county's schools require improvements as well and a general reorganization of the school system appears appropriate, as recommended by the Commissioner. A more

---

9. In *Smith v. Groce*, the county commission was permitted to adopt a somewhat smaller budget than that recommended by the board of education; this action was seen to be within its discretion under what is now codified as T.C.A. §§ 49-2-101 and 49-2-102.

cost-effective use of funds than building the new Wynn School exists. Moreover, the provision of the statute under which Relators claim that a duty exists on the part of Defendants has previously been and continues to be construed as a discretionary provision; no merely ministerial duty is created by T.C.A. § 49–2–101(8). Nothing has occurred to divest Defendants of their discretion to disapprove the Wynn School proposal.

Consequently, after fully considering all the facts and circumstances, the entire body of relevant law, and the appropriateness of the remedy of mandamus, we must conclude that no mandamus should issue, not only because the Defendants are clothed with sufficient discretion under the statutes but the circumstances make mandamus inappropriate and contrary to the public interest in this case. "Mandamus is a summary remedy, extraordinary in its nature, and to be applied only when a right has been clearly established, so that there remains only a positive ministerial duty to be performed, and it will not lie when the necessity or propriety of acting is a matter of discretion." *Peerless Construction Co. v. Bass, supra,* 158 Tenn. at 522, 14 S.W.2d at 733. While we are not unsympathetic to the Relators' natural desire to have a community school, we are convinced by this record that Defendants have acted within their discretion, especially absent approval by the State for the proposed school, and in the best interests of the county as a whole in refusing to fund the new Wynn School. The people of the entire county share the Relators' interest in the quality of education and also must share the tax burden that results from the Board's decisions.

Accordingly, we reverse the judgment of the Chancery Court for Campbell County and order that this case be dismissed. The costs are taxed to the Relators.

HARBISON, C.J., and FONES, COOPER and O'BRIEN, JJ., concur.